In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2270 & 05-2483

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS J. ROSBY and JOHN M. FRANKLIN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:01 CR 13—**James T. Moody**, *Judge.*

ARGUED JUNE 2, 2006—DECIDED JULY 19, 2006

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Monon Corporation once was among the largest manufacturers of over-the-road semi-trailers, containers, and container chassis, producing about 150 units a day. Early in 1996, however, Monon's principal customer cut back on orders and the lost business could not be replaced. Production fell to about 100 units a day in January 1996, dropping to 60 in April and 50 in August. This decline in sales produced a liquidity crisis, as the firm's fixed obligations and payroll could not be cut as fast as the order book shriveled. Thomas Rosby, Monon's CEO and holder of 72% of its equity, and John Franklin, its CFO and holder of 14%, watched the finances closely.

Much of Monon's working capital came from Congress Financial Corporation, a factor that advanced credit on the security of Monon's inventory and receivables. Monon could draw on the credit as soon as it started production of each new unit. During 1996 Monon began a bill-ahead fraud. It would, for example, report starting 60 units on a day when only 50 actually entered production. As sales continued to decrease, however, Monon had to report more and more early starts, so that it could retire older advances. Congress was left unsecured for the difference between actual and reported production. The unsecured draw against the revolving credit increased from about $2 million in March 1996 to $5.9 million in August, when Congress discovered the fraud. After Monon filed for bankruptcy on September 1996, Congress completed many of the falsely reported units at its own expense and risk. Its net loss was about $1.8 million.

Monon also borrowed from A.I. Credit Corporation and Anthem Premium Finance. These firms made loans that Monon was supposed to use to prepay insurance policies; Monon agreed to retire the loans with monthly payments roughly equal to the cost of insurance for that month, and the balance was secured by the policies' cash value. (For simplicity we refer to all of this as "insurance" even though some workers' compensation coverage was arranged through other devices.) If, for example, Monon secured workers' compensation coverage for $5 million a year, the premium finance company would advance that money; the unearned portion of the premium (that is, the premium attributable to future months) would be returned if Monon should cancel the policy and thus could be used as security for the loans. During 1996 Monon reported making larger prepayments than it actually had done. This left A.I. Credit and Anthem unsecured for the difference, and after Monon's bankruptcy Anthem was saddled with net losses of about $4.9 million and A.I. Credit about $2 million.

A grand jury charged Rosby and Franklin with mail and wire fraud for making (or causing to be made) the misrepresentations that persuaded the lenders to advance funds without the promised security. Michael Peterson, Monon's insurance broker, was indicted at the same time and pleaded guilty; he testified for the prosecution. Following the jury's guilty verdict, both Rosby and Franklin were sentenced to 87 months in prison plus restitution of about $8.7 million (the sum of the three lenders' net losses).

Defendants' principal arguments in this court collapse to a single contention: that the false representations were not material because, by making prudent inquiries, the lenders could have figured out what Monon was doing. (To the extent defendants maintain that they did not know what the lenders were being told, the jury's contrary conclusion is unimpeachable.) They do not contend that the jury was bound to find that the lenders *actually* understood the truth, and they did not ask for an instruction presenting the knowledge question to the jury, but they do say that even taken in the light most favorable to the prosecution the evidence compels a conclusion that cautious lenders ought to have done more, or better, checking, and that these inquiries would have turned up the truth.

This line of argument starts with *Neder v. United States*, 527 U.S. 1, 20-25 (1999), which held that materiality is an element of the mail-fraud offense under 18 U.S.C. §1341. The Court observed that "fraud" is a staple term of the common law and should be read to include its common-law constituents, including materiality, unless Congress provides otherwise (which it did not in §1341). See also, e.g., *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) (securities fraud entails proof of scienter, because this is required at common law); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) (discussing the materiality requirement); *Dirks v. SEC*, 463 U.S. 646 (1983) (drawing on common law to conclude that securities fraud entails proof of duty to

disclose). Having established that materiality is essential, defendants maintain that at common law a party cannot close his eyes to a known risk or act with indifference to that risk but must make reasonable attempts at self-protection. (For this proposition defendants cite only cases in the Illinois state courts; the significance of that choice will become clear later.) According to defendants, some of the lenders' employees had their suspicions yet failed to follow up. This means, defendants insist, that the representations were not material.

Defendants recognize that under other federal statutes a representation may be material even though the hearer strongly suspects that it is false. A witness commits the crime of perjury, for example, if he lies under oath about a subject important to the proceeding, even though the grand jury believes that it knows the truth. *United States v. Kross*, 14 F.3d 751, 755 (2d Cir. 1994); *United States v. Goguen*, 723 F.2d 1012, 1019 (1st Cir. 1983); *United States v. Richardson*, 596 F.2d 157, 165 (6th Cir. 1979). See also, e.g., *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) (that grand jury already thinks it knows the truth is no defense to a subpoena, for evidence may be material if it can corroborate or refute existing beliefs); *Kungys v. United States*, 485 U.S. 759, 776-80 (1988) (false statement to immigration officials violates 8 U.S.C. §1451(a) even if agency readily could have discovered the truth); *United States v. Whitaker*, 848 F.2d 914, 918 (8th Cir. 1988) (material false statement to investigating agency violates 18 U.S.C. §1001 even if agency knows the truth). A representation is material if it has a tendency to influence the decision of the audience to which it is addressed. See *Neder*, 527 U.S. at 22-23, citing *Restatement (2d) of Torts* §538 (1977); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). By referring to the common law, however, *Neder* departed from the approach of perjury and other false-statement statutes by imposing on the audience a duty to

investigate for its self-protection—or so defendants maintain.

This confuses materiality with reliance. At common law, *both* materiality (in the sense of tendency to influence) and reliance (in the sense of actual influence) are essential in private civil suits for damages. That's why, if the issuer of securities furnishes an investor with the truth in writing, the investor cannot claim to have been defrauded by an oral misrepresentation: whether the writing actually conveys the truth or just calls the oral statement into question, the investor is on notice. See, e.g., *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988). It is also why an investor's disclaimer of reliance on certain representations, as part of a declaration that the investor has done and is relying on his own investigation, defeats a private damages action for securities fraud. See, e.g., *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000); *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 415-17 (1st Cir. 1989) (Breyer, J.); *One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1286-87 (D.C. Cir. 1988) (R.B. Ginsburg, J.).

Reliance is not, however, an ordinary element of federal criminal statutes dealing with fraud. *Neder* so holds for §1341 in particular. "[T]he Government is correct that the fraud statutes did not incorporate *all* the elements of common-law fraud. The common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes." 527 U.S. at 24-25 (emphasis in original). Once the Supreme Court excludes reliance as a separate element of the mail-fraud offense, it will not do for appellate judges to roll reliance into materiality; that would add through the back door an element barred from the front. Reliance is not an aspect of the materiality element in mail-fraud prosecutions. Accord, *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002); *United States v. Gee*, 226 F.3d 885, 891 (7th Cir. 2000).

Defendants do not argue that by extending credit, despite Monon's noncompliance with some of the contracts' written terms, the lenders agreed to modify their arrangements and forego the promised security. Maybe such an argument has been withheld because those employees of the lenders who suspected (or should have suspected) what was afoot lacked authority to change the deal. Episodes modeled on Potemkin villages suggest as much: whenever lenders' senior personnel or auditors called to check on their collateral, Monon scurried to convey the appearance (though not the reality) of extra production starts or insurance with cash value. That Monon continued making misrepresentations demonstrates its belief that truth would have altered its creditors' behavior. Low-level employees' interests may not have been aligned with those of the lenders' investors; employees paid by the hour, or by the amount of credit under their purview, may be inclined to avert their gaze lest they learn of problems, for the costs fall elsewhere. At all events, defendants do not argue that any employee of the lenders with actual authority to approve a change in the contracts' terms by reducing the amount of collateral ever had actual knowledge of what Monon was doing. (Cindy Carroll, a branch manager who knew that A.I. Credit had advanced too much against Monon's 1995 insurance premiums—the principal event that defendants say should have alerted lenders not to trust what Monon was saying in 1996—never told John Rago, A.I. Credit's vice-president of credit and the only person authorized to make lending decisions on its behalf.)

As for defendants' argument that the prosecutor violated the due process clause by withholding exculpatory evidence, see *Brady v. Maryland*, 373 U.S. 83 (1963): the evidence was not even relevant, let alone exculpatory. Before we take this up, however, there is a jurisdictional detour. Before their sentencing both Rosby and Franklin filed motions seeking new trials because of the non-disclosures. The

sentencing occurred as scheduled in April 2005; the district court entered final judgments without mentioning the motions. Some months later, however, while the appeals were pending, the district judge entered an order denying the motions. Defendants did not file new notices of appeal, and the United States contends that this lapse deprives us of jurisdiction.

A district court's action on a Rule 33 motion for a new trial filed *after* sentencing is a new final decision that requires a new notice of appeal. See, e.g., *United States v. Hocking*, 841 F.2d 735, 736 (7th Cir. 1988). But a new-trial motion filed before sentencing must be resolved before sentencing as well. Under the Sentencing Reform Act of 1984 and Fed. R. Crim. P. 35, a district judge lacks authority to retain control of a criminal case for more than seven days after imposing sentence. See *United States v. Smith*, 438 F.3d 796 (7th Cir. 2006). Any pre-sentencing motions must be resolved at or before sentence is imposed—for otherwise the sentence is not a final judgment and the defendants will be frustrated in their attempts to appeal it, at the same time as the district judge retains an unauthorized measure of control over events after sentencing. If the district judge neglects to rule on pending motions, we treat all as denied automatically by the imposition of sentence. See *United States v. Van Wyhe*, 965 F.2d 528, 530 n.2 (7th Cir. 1992). That understanding ends the district judge's role when sentencing occurs, as the Sentencing Reform Act demands, and ensures that the judgment is final so that defendants may press their contentions in a new forum. It also means that there is never a need for an additional notice of appeal to contest rulings (or inaction) on pre-sentencing motions. The district court lost its authority over these cases when the sentences were imposed, and the defendants' notices of appeal brought up all issues—including those that the district court failed to address before sentencing.

*Brady* offers the defendants no assistance, however. They complain that the prosecutor withheld two tidbits that did not come out until shortly before sentencing: first, Anthem Insurance Company had insured the loans that Anthem Premium Finance, its subsidiary, had made to Monon; second, in July 1996 the parent corporation sold its stock in the premium-finance subsidiary to Newcourt Credit Group USA, Inc. How either of these facts could assist the defendants eludes us. That the victim was insured does not make the loss any less; who ultimately bears a loss does not matter in a fraud prosecution. A bank executive who embezzled from his employer could not defend by noting that the bank had been reimbursed by an insurer; no more does reimbursement matter here.

Defendants tell us that the impending sale gave Anthem (the parent) a reason to want its subsidiary to build up its book of business, to make the subsidiary more attractive, and that the subsidiary therefore ignored the risks of nonpayment. But the insurance issued by the parent corporation makes hash of this contention; why would a parent want a subsidiary to throw away money that the parent would have to repay in order to make the subsidiary (and thus Newcourt) whole? Anyway, the possibility that Anthem may have been trying to bamboozle Newcourt does not provide a defense for fraud committed *against* Anthem. Nor does this explain why Congress and A.I. Credit were taken in. Anthem behaved no differently from the other victims. To return to our theme: Defendants do not contend that the record demonstrates Anthem's *actual knowledge* that Monon's representations were false; arguments pro and con about how attentive the lenders' staff may have been to the possibility that Monon was lying are not relevant, because reliance is not an element of the mail-fraud offense.

Defendants' remaining arguments about the convictions do not require discussion, so we arrive at sentencing. The loss calculation was correct—in particular, the district

judge rightly concluded that the loss Congress suffered was $5.9 million (the unsecured advances outstanding when the fraud came to light) rather than $1.8 million (Congress's net loss after it took over Monon' production in bankruptcy in order to minimize its injury). As a result the total loss exceeded $10 million and defendants received the increase provided by U.S.S.G. §2F1.1(b)(1)(P) (1995). (By the parties' agreement the district court used the 1995 Guidelines. Whether this was appropriate is a question that the parties have not addressed. See *United States v. Roche*, 415 F.3d 614, 619 (7th Cir. 2005).) When the intended loss exceeds the realized loss, the former prevails under the Guidelines. See §2F1.1 Application Note 7(b). Congress took an economic risk after Monon's bankruptcy by producing additional units, and it made a profit; there's no reason why Rosby and Franklin should benefit by Congress's entrepreneurial activity, which does not diminish the seriousness of their offense.

After calculating a sentencing range according to the Guidelines, the district judge stated: "Even though departure is authorized in this case, in the exercise of its discretion, the Court will not depart, because, I believe, departure is not warranted under the facts and circumstances of this case." Although sentence was imposed after *United States v. Booker*, 543 U.S. 220 (2005), which made the departure terminology obsolete, see *United States v. Laufle*, 433 F.3d 981, 986-87 (7th Cir. 2006); *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005), defendants did not object to the judge's explanation. Now, however, they contend that it was plain error for the judge to talk (and perhaps to think) in terms of departures. *Booker* gives district judges more discretion than the old departure framework did; to ensure that the district judge knows about and uses this discretion, defendants insist, they must be resentenced.

Yet there is no doubt that the district judge knew about *Booker* (which had been decided more than three months

before sentencing) and its significance. The judge discussed not only the Guidelines but also the sentencing criteria in 18 U.S.C. §3553(a). Since 1987 judges have been explaining their sentences in terms of departures (or decisions not to depart) from the Guidelines. Habits take time to shake off; it is inevitable that some of the old terminology will linger for a few years. Unless there is reason to think that the choice of words made a substantive difference, there is no error at all, let alone a "plain" error—which entails a serious risk that an injustice has been done. See *United States v. Olano*, 507 U.S. 725, 734-37 (1993); *United States v. Dominguez Benitez*, 542 U.S. 74, 80-84 (2004). It is hard to see how the terminology mattered—and easy to see why the district judge discussed departures. The defendants' own motions had asked the judge to "depart" from the Guideline range! The judge used the word "departure" to explain why he was denying a motion for a departure. It is hardly sporting for someone who invites a judge to use a word to complain after he does so. An invited error does not work to the benefit of the litigant who issued the invitation. The 87-month sentences are reasonable, so there is no basis for resentencing.

Restitution is the final issue. The judge ordered defendants to reimburse the lenders for their net losses. Here, at last, reliance could be important—for restitution is fundamentally a civil remedy administered for convenience in the criminal case, see *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005), and as we have mentioned reliance is essential to damages for fraud in private litigation. For one last time, therefore, we reiterate that defendants have not even argued that the people who made business decisions on behalf of the lenders had actual knowledge that Monon was lying about its production starts or insurance purchases.

Lenders and other investors need not look behind representations made to them. See, e.g., *Teamsters Local 282*

*Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir. 1985); *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540 (7th Cir. 1990); *In re Mayer*, 51 F.3d 670 (7th Cir. 1995). Fraud is an intentional tort, and the common law does not require victims of intentional torts to take precautions. See *Restatement (2d) of Torts* §481 (1965). Telling the truth is cheap, while nosing out deceit is expensive. Requiring all lenders, investors, and so on to investigate every representation made to them would be extravagantly wasteful, compared with a legal regime that unconditionally requires speakers to tell the truth on every material topic if they speak at all. Thus investors' gullibility and carelessness do not excuse wilfully false statements or reduce the damages available to the victims. "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Restatement (2d) of Torts* §540 (1977). That rule makes promises credible by making it costly for liars to escape liability later. This gives truth-tellers a commercial advantage, for their costs of doing business are lower than the liars' costs.

A reliance requirement prevents recovery when the truth is known or the risk of an investment (or loan) is apparent; a risky investment that goes bad differs from fraud. See *Mayer*, 51 F.3d at 676. Our opinion in *Angelos* discusses several decisions in Illinois that appear to treat the reliance requirement as obliging investors to investigate the veracity of representations made to them, as a condition of obtaining damages for fraud. This, we assume, is why defendants concentrate on Illinois law when discussing what "the" common law requires in fraud actions. Yet *Angelos* concluded that Illinois appears to be an outlier (if investigation really *is* essential in Illinois, whose case law is not uniform on the issue); we held that such a requirement would not be incorporated into federal law. It would be no more appropri-

ate to do so in a mail-fraud action than in a securities-fraud action. So the restitution award is appropriate under civil-fraud principles.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*