In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-2836 & 05-3165

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

AUGUST C. GHILARDUCCI and
RONALD J. RICHARDSON,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 1101—**David H. Coar**, *Judge*.

---

ARGUED JANUARY 3, 2007—DECIDED MARCH 14, 2007

---

Before EASTERBROOK, *Chief Judge*, and WOOD and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. This case concerns dozens of failed investment deals orchestrated by August C. Ghilarducci, president and owner of Westchester Financial Associates, Inc. ("WFA"), at times with the assistance of his co-defendant Ronald J. Richardson. Ghilarducci and Richardson executed a series of deals in which they charged WFA clients fees for procuring Confirmation of Funds ("COF") letters from financial institutions. The letters purported to show that financial institutions were capable of leasing large sums of money to WFA clients for a short time. Despite the defendants' represen-

tations, the COF letters proved worthless and WFA clients sustained huge financial losses. Ghilarducci executed a second class of investment deals in which he sold historic railroad bonds issued in the late 1800s to clients at enormous mark-ups. WFA clients reaped none of the benefits Ghilarducci promised.

For his role in both schemes, Ghilarducci was convicted by a jury of racketeering, wire fraud, money laundering, making false statements to banks, and filing false tax returns, and received a 190-month sentence. A jury convicted Richardson of racketeering, wire fraud, money laundering, and tax evasion, and he received 140 months for his participation in the COF scheme.

On appeal, Richardson contends that his convictions for racketeering, wire fraud, and money laundering are invalid, because they are premised on false representations that could not have been material to the investors' decision-making. Ghilarducci, whose counsel filed a brief and moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), asked to adopt Richardson's brief (and, by extension, Richardson's sole argument) on appeal. We granted that request. The defendants' joint argument fails, however, because they confuse materiality—a genuine element of criminal fraud—for reliance, a concept without bearing in criminal fraud prosecutions. In his Seventh Circuit Rule 51 statement in opposition to his counsel's *Anders* brief, Ghilarducci proposes several potential arguments for appeal. Each of those arguments would be frivolous.

## I.  BACKGROUND

### A.  *Confirmation of Funds Scheme*

The defendants engaged in the COF scheme between March 1996 and June 2001. As part of the scheme, they

charged WFA clients fees between $200,000 and $1.95 million to procure COF letters that committed financial institutions to "lease" funds to WFA clients for a limited time. The leased funds could then be used in trading programs to generate high profits. Richardson marketed the COF letters and Ghilarducci executed contractual agreements with WFA clients. Altogether, several dozen clients paid over $22 million in fees for the COF letters.

The contracts entered into between WFA and its clients contained a number of warranties, including the following provision indicating that WFA had not made any extra-contractual representations to its clients:

> Applicant acknowledges and agrees that "WFA" has not made any promises or representations other than those contained herein . . . or promised to provide assistance of any kind in obtaining a loan or extension thereto or soliciting any investment or security. Applicant further acknowledges that "WFA" and its, [sic] agents, assigns, brokers and related parties hereby specifically disclaim that any financial benefit of any kind will be realized by Applicant from any payments of any kind made in furtherance or promotion of same or that any debt instrument, as defined above will be available to Applicant.

At trial, WFA clients testified that despite the contractual language, they had relied on oral representations made by the defendants. According to witnesses, both Richardson and Ghilarducci represented that COF deals had been successful in the past, and that future COF deals would also yield high returns. At least one client was made to believe that the COF deals were "a slam dunk." To further alleviate any fears, Richardson promised to introduce WFA clients to trading programs that he had found reliable in the past. Clients also thought any risks

were minimized by representations that their fees would be deposited into, and remain in, an attorney's escrow account until a COF letter issued and trading began.

In fact, however, a WFA attorney testified that there were many instances in which he wired money out of the escrow account at Ghilarducci's direction before a COF letter had issued (and, by implication, before any trading could have begun). The COF letters were issued by foreign banks of questionable repute. One such bank, Maximum Finance Corporation (MFC), although located in Australia, had no license to conduct business in Australia. Its only legitimate basis for claiming itself a bank was its purchase of a banking license for $1000 from the Republic of Nauru. Not surprisingly, the COF letters proved worthless.

In 1997, the Illinois Attorney General's ("IAG") office initiated a civil investigation into WFA's activities after an individual who had purchased a COF letter complained. During the course of the investigation, Ghilarducci conceded that none of his COF deals had been successful, and said he had stopped doing those deals and would not perform any in the future. The defendants did not tell their clients about the investigation and continued to engage in COF deals despite Ghilarducci's representations to the IAG.

## B.  Railroad Bond Scheme

Between September and December 1996, Ghilarducci sold historic railroad bonds issued in the late 1800s to WFA clients, who sought to use the bonds as collateral to secure financing for high-yielding deals. The bonds had a face value of $1000, and WFA paid between $1800 and $5000 per bond. WFA thereafter resold the bonds for as much as $302,000 each, and collected more than $2.5 million in total for the bonds.

To induce sales, Ghilarducci made a series of representations about the railroad bonds. For instance, Albert Ichelson, the largest single bond investor, testified that Ghilarducci said he had paid $151,000 for a particular type of bond and was doing Ichelson a favor by reselling those bonds at the same price. Ghilarducci told Ichelson that although the railroad companies were now bankrupt, "the government's part of the guarantee still existed." And, Ghilarducci provided Ichelson and others with high appraisals of the bonds. During the course of his interactions with clients, however, Ghilarducci learned that the bonds were only valued as collectors' items.

Although Ghilarducci testified that he acted in good faith when selling the bonds, the jury had reason to disbelieve him. Not only did the jury hear that Ghilarducci misrepresented what he paid for the bonds, they were also told that Ghilarducci sold bonds when he had reason to believe they were worthless, and placated suspicious clients through deceit. In August 1996, Ghilarducci obtained an article explaining that one class of railroad bonds, Saginaw railroad bonds, were sold by a now-bankrupt company and that the bonds were mere collectors' items. Moreover, that November, he received a letter from a bond trading program facilitator telling him that the bond program was "fraught with fraud" and that "[m]any bonds are invalid." The facilitator clarified that the suspicions related to Saginaw railroad bonds. Nonetheless, two days later, Ghilarducci sold Ichelson two Saginaw bonds. By May 1997, the bond program facilitator sent Ghilarducci a letter indicating that the bonds had only historic value, because the obligation to pay on the bonds rested with private, long-bankrupt railroads, not the government.

Far from informing his clients of these suspicions, Ghilarducci sought to lull them into inactivity by explaining why the promised pay-outs had yet to occur. Several of

the excuse-laden faxes that Ghilarducci sent to Ichelson in 1996 and 1997 were entered into evidence. Despite Ghilarducci's attempts to pacify Ichelson, Ichelson eventually threatened to contact the Securities and Exchange Commission ("SEC") regarding the railroad bond scheme. Thereafter, Ghilarducci settled with Ichelson for $657,000; ultimately, he settled with all of the bond purchasers, none of whom obtained any profit from the transactions.

The jury convicted Ghilarducci of one count of racketeering (18 U.S.C. § 1962(c)); 17 counts of wire fraud (18 U.S.C. § 1343); nine counts of engaging in monetary transactions in property derived from a specified unlawful activity (i.e., money laundering under 18 U.S.C. § 1957(a)); two counts of making false statements on a loan application (18 U.S.C. § 1014); and six counts of filing a false tax return (26 U.S.C. § 7206(1)). He was sentenced to 190 months' imprisonment and was ordered to pay $20 million in restitution.

Richardson was convicted of one count of racketeering (18 U.S.C. § 1962(c)); eight counts of wire fraud (18 U.S.C. § 1343); two counts of engaging in monetary transactions in property derived from a specified unlawful activity (18 U.S.C. § 1957(a)); two counts of making false statements on a loan application (18 U.S.C. § 1014); and four counts of filing a false tax return (26 U.S.C. § 7206(1)). Richardson received a term of 140 months' imprisonment and was ordered to pay over $19 million in restitution.

On appeal, both Richardson and Ghilarducci (who adopted Richardson's appellate brief) argue that the district court erred in denying their motions for judgment of acquittal because materiality, an essential element of criminal fraud, is missing here. Additionally, Ghilarducci asks us to deny his counsel's motion to withdraw by propounding several potentially nonfrivolous issues. We address the defendants' joint argument and each of Ghilarducci's potential arguments below.

## II. ANALYSIS

*A. Richardson and Ghilarducci's Sufficiency of the Evidence Challenge Fails.*

Both Richardson and Ghilarducci challenge the sufficiency of the evidence in support of their convictions for wire fraud, racketeering, and money laundering, claiming that the prosecution failed to show that any of their alleged misrepresentations to WFA clients were material. To prevail, they must show that when viewing all the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Humphreys*, 468 F.3d 1051, 1054 (7th Cir. 2006).

We agree with the defendants' basic premise that a material misrepresentation must have been made to sustain their convictions, because materiality (i.e., a tendency to influence) is an essential element of a wire fraud prosecution. *See Neder v. United States*, 527 U.S. 1, 20-25 (1999); *United States v. Rosby*, 454 F.3d 670, 673 (7th Cir. 2006). Because several episodes of wire fraud form the predicate for the defendants' racketeering and money laundering charges, their convictions of those crimes likewise depend on a finding of materiality. *See United States v. Anderson*, 809 F.2d 1281, 1283 (7th Cir. 1987) (to convict a defendant of racketeering, a jury must find that the defendant committed at least two predicate acts); 18 U.S.C. § 1957(a) (to convict a defendant of money laundering, a jury must find that the funds were derived from unlawful activity, such as wire fraud).

However, we cannot agree with the manner in which the defendants define materiality. The defendants contend that any oral misrepresentations they might have made were immaterial because investors signed contracts stating that no oral promises had been made. For their argument, the defendants rely in large part on a civil fraud

case, *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), which held that "a written anti-reliance clause precludes any claim of deceit by prior representations." *Id.* at 384. That holding stems from the principle that "a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods." *Id.*

*Rissman* and the reliance concept, however, have no application in the criminal fraud context. Whether or not a victim in fact relied upon a defendant's false representations is irrelevant in criminal fraud cases. *See Neder*, 527 U.S. at 24-25 ("'justifiable reliance' and 'damages' . . . plainly have no place in the federal fraud statutes"); *see also Rosby*, 454 F.3d at 674.

Indeed, we reached that exact conclusion in *Rosby*. In that case, the defendants contended that false representations made to lenders were not material because the lenders continued to conduct business with the defendants although the lenders could have learned of a bill-ahead scheme through investigation. *Rosby*, 454 F.3d at 673. In rejecting the defendants' argument, we noted that under some federal statutes "a representation may be material even though the hearer strongly suspects that it is false. A witness commits the crime of perjury, for example, if he lies under oath about a subject important to the proceeding, even though the grand jury believes that it knows the truth." *Id.* Further, we explained that the defendants had confused materiality with reliance.

> At common law, *both* materiality (in the sense of tendency to influence) and reliance (in the sense of actual influence) are essential in private civil suits for damages. That's why, if the issuer of securities furnishes an investor with the truth in writing, the investor cannot claim to have been defrauded by an oral misrepresentation: whether the writing actually conveys the truth or just calls the oral

statement into question, the investor is on notice. It is also why an investor's disclaimer of reliance on certain representations, as part of a declaration that the investor has done and is relying on his own investigation, defeats a private damages action for securities fraud.

*Id.* at 674. But, we noted, "[r]eliance is not . . . an ordinary element of federal criminal statutes dealing with fraud." *Id.*

That the contracts should have placed the COF-scheme victims on notice of the fact that no oral representation would be honored, does not mean the oral representations were immaterial or without tendency to influence. Many investors testified that various oral representations, particularly representations that the defendants had engaged in successful COF deals in the past and would keep fees in an escrow account until the COF letters issued, influenced their decision to invest. Additionally, the very fact that the defendants made the misrepresentations suggests that the defendants expected the statements to have a tendency to influence prospective investors. *See id.* The defendants' sufficiency challenge therefore fails.

## B.   Additional Issues Advanced by Ghilarducci

### 1.   Any Claim that Ghilarducci's Sixth Amendment Right to an Impartial Jury Was Infringed Would Be Frivolous.

Ghilarducci believes that an argument could be made that his Sixth Amendment right to a trial by a panel of impartial jurors was compromised by the presence of Barbara Jarvis on the jury. During the course of trial, Jarvis voluntarily advised the court that some thirty years earlier she attended high school with the lead

prosecutor in the case. After the jury returned its verdict, the court learned that several years before trial, Jarvis was casually acquainted with an Assistant United States Attorney, who was not involved in the case. Ghilarducci wishes to argue that these two facts were a basis for removing Jarvis for cause, and that their late discovery deprived him of a peremptory challenge. We review a decision to deny a motion for a new trial based on a claim of juror bias for an abuse of discretion, and will only reverse if there is a strong indication of prejudicial error. *See United States v. Medina*, 430 F.3d 869, 875 (7th Cir. 2005).

In addressing this potential argument, we are guided by the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, where the Court set forth the standard for determining when the responses of a potential juror during jury selection mandate a new trial. 464 U.S. 548, 556 (1984). Under that standard, to obtain a new trial, "a party must first show 'that a juror failed to answer honestly a material question on voir dire,' and, if successful, then must demonstrate that 'a correct response would have provided a valid basis for a challenge for cause.'" *Medina*, 430 F.3d at 875 (quoting *Greenwood*, 464 U.S. at 556); *see United States v. Arocho*, 305 F.3d 627, 633 (7th Cir. 2002).

Ghilarducci's proposed argument would fail at square one, because he cannot show that Jarvis failed to answer honestly any material question posed during voir dire. Neither Jarvis's delayed mention of attending high school thirty years before trial with the government's lead counsel nor her failure to mention that she knew someone who worked in the U.S. Attorney's Office was dishonest. During jury selection, Jarvis was only asked to reveal whether any of her family members or close friends were employed by a law enforcement agency. As these attorneys were merely casual acquaintances with whom she was

associated many years before trial, Jarvis honestly answered the questions. Additionally, that Jarvis voluntarily advised the court that the government's lead counsel may have been her high school classmate is further evidence of her honesty. Any argument on this point would therefore be frivolous.

### 2. *Ghilarducci's Proposed Confrontation Clause Argument Is Frivolous.*

Ghilarducci contends that he could argue that by allowing David Sova, a witness suffering from memory loss, to read into evidence his grand jury testimony, the district court violated Ghilarducci's Sixth Amendment right to confront witnesses against him. Evidentiary rulings that might bear on a defendant's right to confront witnesses are subject to de novo review. *See United States v. Ellis*, 460 F.3d 920, 923 (7th Cir. 2006).

The Confrontation Clause gives every accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. That right is realized by affording defendants an opportunity for effective cross-examination. *United States v. Crawford*, 541 U.S. 36, 61 (2004); *United States v. Owens*, 484 U.S. 554, 557 (1988). Importantly, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Ghilarducci therefore wishes to argue that Sova's lack of memory regarding his prior statement was so complete as to deprive Ghilarducci of a meaningful opportunity to cross-examine Sova regarding that statement. After considering the precedent, however, we doubt such is the case.

In *Fensterer*, the Court considered whether the Confrontation Clause was offended when an expert testified in

support of the government's theory that a victim had been strangled using a cat leash. *Id.* at 16. The expert opined that the victim's hair on the leash had been forcibly removed, but could not recall the basis for his belief. *Id.* at 16-17. Reasoning that "it does not follow that the right to cross-examine is denied by the State whenever the witness' lapse of memory impedes one method of discrediting him," *id.* at 19, the Court found no Confrontation Clause violation. The Court admonished that:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id.* at 21-22; *see also Owens*, 484 U.S. at 564 ("[T]he Confrontation Clause . . . is [not] violated by admission of an identification statement of a witness who is unable, because of a memory loss, to testify concerning the basis for the identification."); *United States v. DiCaro*, 772 F.2d 1314, 1327-28 (7th Cir. 1985) (finding that, on the facts, a witness's assertions of memory loss did not deprive the defendant of an effective cross-examination); *Creekmore v. Dist. Ct. of the Eighth Judicial Dist. of Montana*, 745 F.2d 1236, 1238 (9th Cir. 1984); *United States v. Riley*, 657 F.2d 1377, 1386 (8th Cir. 1981); *United States v. Payne*, 492 F.2d 449, 454 (4th Cir. 1974).

The weight of authority suggests that there was no Confrontation Clause violation on these facts. Sova did not claim a total loss of memory regarding the events. Rather, he cooperated with defense counsel's questioning and

succeeded in answering a great number of questions. Ghilarducci's counsel tested Sova's credibility, probing into the severity of Sova's grand mal seizure, whether he had been compensated for his trial or grand jury testimony, and the extensiveness of his contact with government attorneys or agents. By referencing documents that memorialized his interactions with Ghilarducci, Sova was also able to answer some questions on that topic. Therefore, we doubt that Ghilarducci's opportunity to cross-examine Sova fell below constitutional standards.

Ultimately, however, even if it was error to admit Sova's testimony, that error was harmless. *See Murillo v. Frank*, 402 F.3d 786, 791 (7th Cir. 2005) (alleged violations of the Confrontation Clause are subject to harmless error analysis). In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Court held that in assessing whether a Confrontation Clause violation was harmless, a court should consider the importance of the witness's testimony; whether the testimony is cumulative; the presence or absence of evidence corroborating or contradicting the testimony; the extent of cross-examination permitted; and the overall strength of the prosecution's case. *Id.* at 684.

Each of these factors leads to a conclusion that any error in allowing Sova to read his statement was harmless. The prosecution gave Sova's testimony little importance, not even referencing it during closing argument. His testimony was largely cumulative and corroborated; it restated several points revealed in exhibits. As stated above, cross-examination was fairly extensive and was only occasionally hampered by Sova's memory lapses.

Most importantly, even without Sova's grand jury testimony, the prosecution had a strong case; the jury was presented ample evidence of the defendant's role in the railroad bond scheme. Faxes sent by Ghilarducci consistently reassuring clients that the railroad bonds were

legitimate and that a payout was imminent were admitted into evidence without objection. The jury heard Ichelson testify that before investing over $1.3 million in the railroad bonds, Ghilarducci told him that the bond trading program had been operating for five years without a failure, and that Ghilarducci had buyers on hand ready to buy out any dissatisfied investor. WFA employee Brian McGuire testified that he told Ghilarducci in 1997 that the government had no interest in the railroad bonds and that the individual who appraised the bonds was being investigated by the SEC. According to McGuire, that information was never passed on to customers. In light of the evidence, if there was a Confrontation Clause problem (and we do not believe there was), it was harmless. For that reason, Ghilarducci could not proffer a nonfrivolous Confrontation Clause argument.

### 3.  *Ghilarducci's Simultaneous Indictments Do Not Implicate the Double Jeopardy Clause.*

Ghilarducci believes a nonfrivolous argument could be made that he was held in double jeopardy by virtue of his simultaneous indictments for wire fraud in the United States District Court for the Northern District of Illinois and for mail fraud in the United States District Court for the Eastern District of California. *See* U.S. Const. amend V (providing that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb"). This argument would fail because mail and wire fraud are distinct crimes. Specifically, the Double Jeopardy Clause is not offended when a defendant is convicted under two provisions, so long as "each provision requires proof of a fact which the other does not." *Brown v. Ohio*, 432 U.S. 161, 166 (1977) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Because wire and mail fraud require proof of at least one distinct fact (the existence of

a mailing or wire transmission), Ghilarducci cannot advance a nonfrivolous argument under the Double Jeopardy Clause.

*4. The District Court Did Not Abuse Its Discretion in Denying Ghilarducci's Second Motion to Extend the Time for Filing Post-Trial Motions.*

As another potential appellate issue, Ghilarducci contends that the district court erred in denying his second request to extend the time for filing post-trial motions. We disagree. A court's denial of a motion for an extension is reviewed for abuse of discretion. *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998). At the time this case was before the district court, Rule 45 of the Federal Rules of Criminal Procedure only allowed extensions of time to file Rule 29 motions for judgment of acquittal and Rule 33 motions for a new trial as determined by those rules. *See* Fed. R. Crim. P. 45(b)(2) (2004) ("The court may not extend the time to take any action under Rules 29, 33, 34, and 35, except as stated in those rules.").

Rule 29 provided that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets *during the 7-day period*." Fed. R. Crim. P. 29(c)(1) (2004) (emphasis added). Likewise, Rule 33 provided that motions for a new trial not based on newly discovered evidence must be filed within seven days of the verdict or finding of guilty, or "within such further time as the court sets *during the 7-day period*." Fed. R. Crim. P. 33(b)(2) (2004) (emphasis added). Under the plain language of the rules, the district court had no authority to grant an extension of time to file a post-trial motion for

judgment of acquittal or new trial more than seven days after the verdict or jury discharge.

Here, the jury issued its verdict on December 15, 2004 and was discharged on December 17, 2004. Therefore, motions to extend had to be filed and granted within seven days of December 17, excluding weekends and holidays. The only request for extension made before that date (December 29, 2004) occurred on December 16, 2004. The court granted that motion, setting the outer limits for filing any post-trial motions at January 31, 2005. Ghilarducci did not file his post-trial motion during that time period. Instead, on January 28, 2005, he requested a further extension of the deadline to file post-trial motions. The court did not abuse its discretion in denying that untimely request. *See* Fed. R. Crim. P. 45, 29, 33; *see also United States v. Canova*, 412 F.3d 331, 345 (2d Cir. 2005); *United States v. Hocking*, 841 F.2d 735, 737 (7th Cir. 1988).[1] Any argument on this point would be frivolous.

5.  *The District Court Did not Err in Admitting Testimony Regarding Ghilarducci's Negotiations with the Illinois Attorney General's Office.*

Ghilarducci would also take issue with the district court's decision to allow testimony regarding a proposed settlement between Ghilarducci and the Illinois Attorney General's office. Contrary to Ghilarducci's suggestion, in

---

[1]  Rule 45(b) was amended in April 2005. The amended provision, which took effect on December 1, 2005, provides in relevant part that "The court may not extend the time to take any action under Rule 35, except as stated in that rule." Although the new rule still requires that defendants file their Rule 29 and 33 motions within the seven-day periods discussed in those rules, Rule 45 no longer requires the court to act on those motions within a defined period of time.

allowing the testimony, the district court did not violate Federal Rule of Evidence 408, because the Seventh Circuit has long held that Rule 408 only applies in civil cases. *See, e.g.*, *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir. 1994).

### 6. *Ghilarducci's Argument for Overturning His Money Laundering Conviction Is Frivolous.*

Finally, Ghilarducci seeks to argue that his money laundering convictions must be reversed because the government failed to prove that he attempted to conceal the proceeds of any criminal activity. Ghilarducci's contention would fail simply because he relies upon the wrong money laundering provision. He was charged with money laundering under 18 U.S.C. § 1957, not 18 U.S.C. § 1956, as he contends. A defendant is guilty of money laundering under Section 1957 if while in the United States, the defendant knowingly engages in a monetary transaction in criminally derived property that has a value in excess of $10,000 and that is derived from specified unlawful activity. There is simply no concealment requirement under 18 U.S.C. § 1957. Accordingly, this argument would fail.

### III.  CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court. We also GRANT counsel's motion to withdraw and DISMISS Ghilarducci's appeal.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*