In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3224

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON B. DALE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 CR 40078—**J. Phil Gilbert,** *Judge.*

———————

ARGUED JUNE 4, 2007—DECIDED AUGUST 17, 2007

———————

Before RIPPLE, ROVNER and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Jason B. Dale was indicted on one count of conspiring to manufacture and to distribute 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 841 and 846. Mr. Dale pleaded guilty and was sentenced to 180 months' imprisonment. Before this court, he contends that the district court erred when it applied a two-level increase to his offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1. He further claims that his sentence is unreasonable. For the reasons set forth in this opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A.**

Mr. Dale and his father were involved in a conspiracy to manufacture and to distribute methamphetamine that lasted from July 2002 until May 2005. During that period, Mr. Dale not only sold methamphetamine but used the drug himself. While participating in the conspiracy, Mr. Dale exhibited violent behavior. He threatened a number of people with violence to avoid prosecution and had threatened and beaten a former girlfriend whom he suspected of cooperating with law enforcement. Additionally, following an arrest for driving under the influence, Mr. Dale had threatened to kill the arresting officer and to rape the officer's daughter.

In May 2005, Mr. Dale was confronted about his lifestyle by C. Randall Shively, his then-current girlfriend's father. Mr. Dale left the conspiracy, and Shively took Mr. Dale into his home. Over the next few months, Mr. Dale stopped using methamphetamine and broke off contact with his father. At some point, Mr. Dale began attending religious services and substance abuse counseling meetings and had enrolled in college classes. In November 2005, Mr. Dale learned of a warrant for his arrest in connection with the methamphetamine conspiracy. He surrendered to authorities the following day and was released on a recognizance bond.

**B.**

Mr. Dale was charged with conspiring to manufacture and to distribute more than 500 grams of a substance

containing methamphetamine. In May 2006, Mr. Dale pleaded guilty to the charge, but remained on bond pending sentencing.

On June 30, 2006, the Probation Department issued its presentence investigation report ("PSR"). The PSR identified Maria Winchester, Mr. Dale's cousin, as a potential witness against him based on an encounter in May 2005.[1] On the night of July 9, 2006, while Mr. Dale remained on bond awaiting sentencing, Mr. Dale and his brother-in-law, Matt Carr, went to the Pasta House restaurant, where Winchester worked. They went there in order to meet Mr. Dale's girlfriend and another woman. When Winchester walked past the table where they were sitting, she heard someone call her "snitch" or "bitch" and other profane or otherwise derogatory names. Winchester told her manager, Vickie Sue Niles, about the comments. Niles approached the table to confront Mr. Dale and the others. Mr. Dale attempted to explain his version of events, but the confrontation soon escalated. Mr. Dale swore at Niles and got up to leave the restaurant. Mr. Dale passed Winchester as he left the restaurant and threatened to kill her.

---

[1] In that incident, Mr. Dale had visited Winchester at work following a police raid and had tried to give her a coat to hold. According to Winchester, Mr. Dale told her that he was afraid that he would be arrested and he did not want the police to seize cash in his coat. Winchester refused to take the coat, but Mr. Dale left his coat with her anyway. Either Winchester or her boss discovered cash and methamphetamine in the coat's pockets and called the police. Mr. Dale subsequently was arrested. Following his arrest, Mr. Dale called Winchester's home and left threatening messages with her father.

Mr. Dale's bond was revoked because of his threat to Winchester and because he had consumed alcohol while on bond. The Government then requested, and the Probation Department recommended in a revised PSR, that the district court apply § 3C1.1 and impose a two-level increase in Mr. Dale's offense level as a result of the threats made by Mr. Dale to Winchester.

At sentencing, the district court heard testimony from a number of individuals. Some testified about Mr. Dale's conduct when he was involved in the conspiracy; others testified to the personal progress that Mr. Dale had made since May 2005. The district court also heard testimony from Winchester and from co-workers regarding the incident at the Pasta House. Winchester and others testified that, following the confrontation between Mr. Dale and Winchester's supervisor, Mr. Dale had threatened her life. The district court credited this testimony and, because Winchester had been a potential witness in Mr. Dale's sentencing at the time of the threat, imposed a two-level increase in Mr. Dale's offense level under advisory guidelines § 3C1.1 for obstruction of justice.

The district court also applied a two-level enhancement for possession of a firearm in furtherance of the conspiracy and a three-level decrease for acceptance of responsibility. This brought Mr. Dale's total offense level to 35.[2] With

---

[2] In arriving at Mr. Dale's base offense level, the district court adopted the drug quantities attributed to Mr. Dale in the PSR. These quantities included 113.62 grams of methamphetamine and 340.20 grams of ice. Applying the drug equivalency tables in § 2D1.1 of the advisory guidelines, these quantities are equivalent to 7,031.24 kilograms of marijuana. *See* U.S.S.G.

(continued...)

Mr. Dale's criminal history category of I, this computation resulted in an advisory guidelines range of 168-210 months' imprisonment. After considering the § 3553(a) factors and hearing from the Government and Mr. Dale, the court imposed a sentence of 180 months' imprisonment.

## II

## DISCUSSION

Mr. Dale now appeals his sentence. He contends that the district court erred when it imposed a two-level enhancement for obstruction of justice. He further submits that the sentence imposed was unreasonable in light of § 3553(a). "We review the district court's application of the Guidelines de novo and its factual determinations for clear error." *United States v. Warren*, 454 F.3d 752, 762 (7th Cir. 2006). We review the sentence imposed by the district court taken as a whole for reasonableness in light of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005).

---

[2] (...continued)
§ 2D1.1 Application Note 10 (providing drug equivalency tables as a means of combining quantities of different drug types when calculating a base offense level). The base offense level for more than 3,000 kilograms but less than 10,000 kilograms of marijuana is 34. Thus, starting from a base offense level of 34, the district court added two levels to Mr. Dale's offense level for obstruction of justice and two levels for possession of a firearm for an offense level of 38. The court then reduced Mr. Dale's offense level by three levels for acceptance of responsibility to arrive at a total offense level of 35.

**A.**

Mr. Dale first asserts that the district court erred when it applied guidelines § 3C1.1 to impose a two-level increase in his offense level for obstruction of justice based on the threat made to Winchester. After hearing testimony regarding the events at the Pasta House on July 9, 2006, the district court concluded that Mr. Dale had threatened Winchester's life and that the threat constituted an obstruction of justice under § 3C1.1. Mr. Dale submits that these factual findings do not support an enhancement for obstruction of justice under § 3C1.1 because the facts do not demonstrate that Mr. Dale threatened Winchester *because* she was a potential witness against him.

Whether a statement can constitute obstruction of justice presents a legal interpretation of the guidelines and is subject to plenary review. *See United States v. Gibson*, 155 F.3d 844, 846 (7th Cir. 1998) ("Whether a . . . statement can constitute an express threat of death involves the legal interpretation of a sentencing guideline which we review de novo."). If a statement, as a matter of law, can constitute an obstruction of justice, the determination of whether the statement *did* constitute an obstruction of justice under the circumstances is a question of fact which we review for clear error. *See United States v. Hanhardt*, 361 F.3d 382, 387 (7th Cir. 2004), *vacated on other grounds*, *Altobello v. United States*, 543 U.S. 1097 (2005); *Gibson*, 155 F.3d at 846. Clear error occurs when "after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." *Hanhardt*, 361 F.3d at 388 (citing *United States v. McGill*, 32 F.3d 1138, 1143 (7th Cir. 1994)).

The advisory guidelines impose a two-level enhancement to a defendant's offense level for obstruction of justice in connection with the investigation, prosecution

or sentencing related to the defendant's offense of conviction.[3] U.S.S.G. § 3C1.1. Such obstructive conduct includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.* Application Note 4(a). We have held that § 3C1.1 "requires specific intent to obstruct justice," and the burden rests on the Government to establish such intent by a preponderance of the evidence. *United States v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997); *see also United States v. Henderson*, 58 F.3d 1145, 1153 (7th Cir. 1995).[4] This intent requirement flows from

---

[3]  The advisory guidelines provide:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (2005).

[4]  The Government, relying on *United States v. Johnson*, 46 F.3d 636 (7th Cir. 1995), submits that any time a witness or potential witness is threatened, § 3C1.1 permits the sentencing court to increase the defendant's offense level for obstruction of justice. Although some language in *Johnson* appears to support this contention, *see id.* at 638 ("A threat to a potential witness is sufficient to warrant an enhancement under section 3C1.1, as long as the statement was intended to threaten, intimidate or unlawfully influence that person."), our cases both before and after *Johnson* make clear that the burden is on the Government to establish that the defendant acted with the specific intent to obstruct justice. *See United States v. Ewing*, 129 F.3d 430, 434 (7th

(continued...)

the text of the guideline, which calls for an enhancement when the defendant "willfully obstruct[s] or impede[s], or attempt[s] to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (2005); *see also United States v. Altman*, 901 F.2d 1161, 1164 (2d Cir. 1990).

Mr. Dale submits that the district court erred when it applied § 3C1.1 because the Government did not establish that he acted with specific intent. He points to the district court's statement at sentencing that

> [a]nytime someone states [] to someone who is a witness or potential witness or was part of the discovery that provided [] the information for the government during the investigation of the instant offense, threatens to kill somebody, I can't think of any[]more obstructive behavior than that.

R.89 at 152. Standing alone, this statement suggests that the district court believed that *any* threat to a potential witness constituted obstruction, regardless of whether

---

⁴ (...continued)
Cir. 1997) (after); *United States v. Henderson*, 58 F.3d 1145, 1153 (after) (7th Cir. 1995); *United States v. Cotts*, 14 F.3d 300, 307 (7th Cir. 1994) (before). We note that this requirement is in accord with each of the other circuits to have addressed the issue. *See, e.g., United States v. Chavarria*, 377 F.3d 475, 479 (5th Cir. 2004); *United States v. Gormley*, 201 F.3d 290, 294 (4th Cir. 2000); *United States v. Parrott*, 148 F.3d 629, 635 (6th Cir. 1998); *United States v. Belletiere*, 971 F.2d 961, 965 (3d Cir. 1992); *United States v. Hernandez*, 967 F.2d 456, 459 (10th Cir. 1992); *United States v. Watts*, 940 F.2d 332, 332-33 (8th Cir. 1991); *United States v. Altman*, 901 F.2d 1161, 1164 (2d Cir. 1990).

the statement was made with the specific intent to obstruct justice. However, viewing the record as a whole, we do not believe that the district court misapprehended the intent necessary to impose an enhancement under § 3C1.1.

Before ruling on the applicability of the obstruction enhancement, the court read the full text of § 3C1.1 into the record, including the requirement that the defendant act willfully in order for his conduct to fall within the enhancement. Because the specific intent requirement is derived from the text of the guideline itself, *see Altman*, 901 F.2d at 1164, we shall infer that the district court understood that the enhancement applied only to willful conduct. Although the district court did not find explicitly that Mr. Dale acted with the specific intent to obstruct justice, the court did conclude that the threat to Winchester was "obstruction under the guidelines." R.89 at 153. Because we believe that the district court understood § 3C1.1 to require a specific intent to obstruct, the court's conclusion that Mr. Dale's threat constituted obstruction under the guidelines includes implicitly a finding that Mr. Dale intended to obstruct justice for purposes of the advisory guidelines.

Further, based on the evidence before the court, the district court's conclusion that the threat amounted to obstruction of justice under § 3C1.1 does not constitute clear error. At sentencing, the court heard testimony of prior threats against Winchester by Mr. Dale and that, on the date of the Pasta House confrontation, Mr. Dale had received the PSI that had identified Winchester as a potential witness against him. Further, Winchester testified at the sentencing hearing that, before the threat, Mr. Dale had been making derogatory remarks toward her.

From this evidence, the court could conclude that Mr. Dale's comments toward Winchester before the actual threat were intended to harass or intimidate her because of her possible testimony. The court further could conclude that, after the confrontation with Niles, Mr. Dale became angry and escalated his intimidation to a direct threat on Winchester's life. On this record, we are not left "with the definite and firm conviction that a mistake has been committed." *Hanhardt*, 361 F.3d at 388 (citing *McGill*, 32 F.3d at 1143). Therefore, there was no clear error in the district court's calculation of Mr. Dale's advisory guidelines range.

**B.**

We now turn to Mr. Dale's assertion that the sentence imposed by the district court was unreasonable in light of § 3553(a).[5] He contends that the sentence was unreasonable because the court failed to consider sufficiently Mr. Dale's personal characteristics that are not accounted for by the advisory guidelines. He further submits that his sentence was unreasonable because the court failed to consider adequately the reasonableness of his sentence

---

[5] The Government asserts that, because Mr. Dale did not object before the district court to the reasonableness of his sentence, our review is for plain error. We have held, however, that a defendant need not object to his sentence on the grounds that it is unreasonable to preserve appellate review for reasonableness. *See United States v. Castro-Juarez*, 425 F.3d 430, 433-34 (7th Cir. 2005). Thus, failure on the part of Mr. Dale to object to his sentence on the specific ground that it was unreasonable did not result in forfeiture of the argument and plain error does not apply.

in light of § 3553(a)'s sentencing factors or to explain adequately its consideration of those factors.

**1.**

We turn first to Mr. Dale's contention that the district court failed to consider adequately his personal characteristics not accounted for by the advisory guidelines. At sentencing, Mr. Dale asserted that personal characteristics, such as his socio-economic status, the fact that he had become involved with the methamphetamine as a result of his father, his past substance abuse and his subsequent voluntary and "extraordinary" rehabilitation efforts warranted a sentence at the low end of the advisory guidelines range. The district court concluded that these personal characteristics did not warrant a departure from the guidelines and imposed a sentence in the middle of the advisory guidelines range. Mr. Dale contends that, because the advisory guidelines do not account for these personal characteristics, the district court relied upon the advisory guidelines to the exclusion of all other § 3553(a) factors.

Mr. Dale correctly states that district courts have discretion to consider factors other than the advisory guidelines when imposing a sentence. The court's discretion in selecting a sentence is cabined by § 3553(a), and it cannot "import [its] own philosophy of sentencing if it is inconsistent with" the § 3553(a) factors. *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). Of course, the district court can place significant weight on the guidelines without rendering the resulting sentence unreasonable.[6]

_____

[6] Mr. Dale points to the district court's use of the term "downward departure" as evidence of the district court's "over-
(continued...)

The sentence imposed must be reasonable with respect to the factors enumerated in § 3553(a), and among those factors is the advisory guidelines. *See* 18 U.S.C. § 3553(a)(4)(A). Indeed, the advisory guidelines themselves "seek to embody the § 3553(a) considerations." *Rita v. United States*, 127 S. Ct. 2456, 2464 (2007); *see also United States v. Gama-Gonzalez*, 469 F.3d 1109, 1110-11 (7th Cir. 2006).

Nevertheless, Mr. Dale asserts that the district court relied on the advisory guidelines to the near-exclusion of other factors and that this approach was no different than treating the advisory guidelines as mandatory, thereby violating his Sixth Amendment rights under *United States v. Booker*, 543 U.S. 220 (2005). We cannot accept this argument. Judicial fact-finding at sentencing offends the Sixth Amendment only when the applicable "law *forbids* a judge to increase a defendant's sentence *unless* the judge finds facts that the jury did not find (or the offender did not concede)." *Rita*, 127 S. Ct. at 2466. The Supreme Court in *Booker* held that such Sixth Amendment problems arise when a sentence "is imposed under a mandatory sentencing scheme." *United States v. White*, 443 F.3d 582, 592

---

[6] (...continued)

reliance" on the guidelines in assessing his sentence in light of the § 3553(a) factors. Although *United States v. Booker*, 543 U.S. 220 (2005), renders the concept of "departures" obsolete, we have held that, unless there is reason to believe that the use of the term "departures" made a substantive difference, there is no error when using the term. *See United States v. Rosby*, 454 F.3d 670, 676-77 (7th Cir. 2006). This is particularly so when the defendant invites the court to use the term by asking for a "departure" in the first place, as is the case here. *See id.* at 677.

(7th Cir. 2006). However, as long as the district court treats the guidelines as advisory, the constitutional infirmity identified in *Booker* is eliminated. *Id.* Here, the district court stated explicitly that it considered the guidelines advisory. The court also stated that it had taken into account Mr. Dale's personal characteristics when arriving at his sentence. Therefore, we cannot conclude that the district court's reliance on the advisory guidelines rendered his sentence unreasonable.

## 2.

Mr. Dale next asserts that the district court failed to account sufficiently for § 3553(a)'s sentencing factors. Post-*Booker*, we require the sentencing court to follow a two-part procedure in arriving at its sentence. *United States v. Holt*, 486 F.3d 997, 1007 (7th Cir. 2007). First, the court must calculate the defendant's advisory guidelines sentencing range. *Id.* Second, the court then must consider the factors set forth in § 3553(a). *Id.* As already discussed, the district court correctly calculated Mr. Dale's advisory guidelines range.

When considering the § 3553(a) factors, the district court must give the defendant the opportunity to invite the court's attention to those factors that might warrant a non-guidelines sentence. *Id.* The court then must provide "an adequate statement of the judge's reasons, consistent with section 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant." *Dean*, 414 F.3d at 729. Although the statement must provide an *adequate* basis for the court of appeals to review the district court's decision, the district court need not "rehearse on the record all of the considerations that 18 U.S.C. § 3553(a) lists." *Id.* (citing *United States*

*v. George*, 403 F.3d 470, 472-73 (7th Cir. 2005)). The record simply must confirm that the district court "has given meaningful consideration to the section 3553(a) factors." *Williams*, 425 F.3d at 480.

At sentencing, after the district court calculated Mr. Dale's advisory guidelines range, the Government requested a sentence in the middle of the advisory guidelines range and the court gave Mr. Dale the opportunity to set forth his arguments for a lower sentence, including a non-guidelines sentence. Mr. Dale pointed to his socio-economic status, the fact that he had become involved with the methamphetamine as a result of his father, his past substance abuse and his subsequent voluntary and "extraordinary" rehabilitation efforts as reasons justifying a sentence at the bottom of the advisory guidelines range. Mr. Dale contended that, because the advisory guidelines do not account for these factors, a sentence at the low end of the advisory guidelines was commensurate with his true culpability.

After Mr. Dale had concluded his statement, the court stated that, when reaching its final sentencing decision, it would consider the § 3553(a) factors, "including the nature and characteristics of this defendant, the offense, the need for rehabilitation, [and] the need for deterrence." R.89 at 156. This record demonstrates that the district court followed the procedures that we have set out for determining a defendant's sentence. Because the sentence imposed was within the properly-calculated advisory guidelines range, it is entitled to a presumption of reasonableness. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). The record confirms that this presumption is well-founded in the present case.

After considering Mr. Dale's personal characteristics, the court expressed concern that the progress Mr. Dale had made was not as great as Mr. Dale had contended, particularly in light of his violation of his bond by consuming alcohol and the threat made to Winchester. With respect to Mr. Dale's offense of conviction itself, the district court pointed to testimony that it had heard regarding Mr. Dale's conduct while he was engaged in this offense, including testimony about threats of violence that he made to police officers and a former girlfriend. Additionally, the district court noted the serious nature of Mr. Dale's offense, involving a conspiracy to manufacture and to distribute methamphetamine spanning three years. In light of these considerations, we believe that the district court's decision to impose a sentence in the middle of the advisory guidelines range was reasonable in light of § 3553(a).

### 3.

Mr. Dale also asserts that the presumption of reasonableness afforded to sentences within the advisory guidelines range renders the guidelines effectively mandatory, and thereby violates his Sixth Amendment rights under *Booker*. This contention was rejected by the Supreme Court in *Rita v. United States*, 127 S. Ct. 2456 (2007). In *Rita*, the Court held that the Sixth Amendment does not prohibit an appellate presumption of reasonableness to within-guidelines sentences, even if such presumption encourages district courts to impose sentences within the advisory guidelines. *Id.* at 2466-67.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*