14-4208-cr(L)
*United States v. Greenberg*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2015

(Argued: January 11, 2016     Decided: August 31, 2016)

Nos. 14-4208-cr(L), 14-4278-cr(con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

DANIEL GREENBERG,

*Defendant-Appellant.*

_____

Before:     STRAUB, LIVINGSTON, and CHIN, *Circuit Judges.*

Defendant-Appellant Daniel Greenberg appeals from a corrected judgment of conviction, entered on November 7, 2014, in the United States District Court for the Eastern District of New York (Spatt, *J.*).   Following a jury trial, Greenberg was convicted of all thirteen counts in the Superseding Indictment, including wire fraud, access device fraud, aggravated identity theft, and money laundering.   A summary order issued concurrently with this opinion addresses and rejects most of Greenberg's claims on appeal.   This opinion addresses two of Greenberg's challenges to his conviction.   First, we consider whether the district court erred in denying Greenberg's motion to

1

dismiss the Superseding Indictment for spoliation of evidence. We conclude, relying on *Arizona v. Youngblood*, 488 U.S. 51 (1988), that Greenberg failed to show bad faith, so that his motion was properly denied. Second, we consider whether the district court erred in denying Greenberg's motion to dismiss the wire fraud counts because of a "lack of convergence" between the parties injured and those deceived by Greenberg's scheme. Here, we join our sister circuits and decline to find the existence of a convergence requirement for wire fraud. Accordingly, the judgment of conviction is **AFFIRMED**.

| | |
|---|---|
| FOR APPELLEE: | CHARLES N. ROSE, David C. James, Walter M. Norkin, Assistant United States Attorneys, New York, N.Y., *for* Robert L. Capers, United States Attorney for the Eastern District of New York, *for the United States of America.* |
| FOR DEFENDANT-APPELLANT: | ERIC M. CREIZMAN, Creizman PLLC, New York, N.Y., *for Daniel Greenberg.* |

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This appeal arises from Daniel Greenberg's conviction of wire fraud, access device fraud, aggravated identity theft, and money laundering in connection with a scheme to make unauthorized credit card charges to the credit cards of customers of Greenberg's digital retail company, Classic Closeouts, LLC ("CCL"). During the summer of 2008, there were approximately 77,000 unauthorized charges to these customer cards, totaling approximately $5 million, all supposedly related to a "Frequent Shopper Club" program at CCL. Following a civil case brought by the Federal Trade Commission ("FTC") and a

2

criminal investigation, the Government filed a Superseding Indictment, charging Greenberg with eight counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii); one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), 1028A(c), and 1028A(c)(5); and three counts of money laundering through unlawful monetary transactions, in violation of 18 U.S.C. § 1957(a). Greenberg was convicted of all counts in January 2014, after a jury trial.

This opinion addresses two of Greenberg's arguments on appeal.[1] First, Greenberg contends that the district court erred in denying his motion to dismiss the Superseding Indictment for spoliation of evidence. Next, he argues that the wire fraud counts should have been dismissed because of a "lack of convergence" between the parties injured and those deceived by the "Frequent Shopper Club" scheme. We reject both arguments and, accordingly, affirm the judgment of conviction.

---

[1] Greenberg raises additional arguments that are addressed and rejected in a summary order issued concurrently with this opinion.

# BACKGROUND

## I.   Factual Background[2]

From 2002 until 2009, Greenberg owned and operated CCL, an Internet retailer of discounted clothing and other merchandise.  Greenberg served as CCL's president and managing member, and was the sole signatory on CCL's accounts.  CCL operated from 110 West Graham Avenue in Hempstead, New York ("the Premises").  CCL maintained a website, classiccloseouts.com, from which it sold its merchandise.[3]  The website was certified by TRUSTe, an independent organization that certifies the privacy practices of its Internet licensees.[4]

---

[2] The factual background regarding the crimes of which Greenberg was convicted is derived from the testimony and evidence presented at Greenberg's trial. Additional background is based upon the record and is undisputed or attributed to a particular party, as noted.

[3] CCL's goods were also included on aggregator retail websites, including Shop.com, which compile a searchable digital database of the items offered on, and link to, multiple merchants' websites.

[4] The TRUSTe certification gives a website the right to post the TRUSTe logo on its site, as an indication of the reliability of its privacy practices.  TRUSTe has a consumer privacy-related dispute resolution service, which allows consumers to report complaints about its licensees so that TRUSTe can then investigate and identify whether the licensee should be required to take any corrective measures to remain in the program.

In order to process credit or debit card charges for purchased items, CCL maintained a merchant account with Bank of America Merchant Services ("BAMS").[5]  In 2006, CCL entered into an agreement with Cynergy Data, LLC ("Cynergy") to serve as CCL's payment processor, an intermediary between the acquiring bank—BAMS—and the merchant—CCL.  The agreement established a fee schedule that included a "rolling reserve," an amount of money set in reserve by the payment processor to offset any "chargebacks" incurred by the merchant.  A chargeback occurs when a cardholder contacts his issuing bank to dispute a charge appearing on his account statement, and the issuing bank charges that amount back to the acquiring bank.  A "reversal" occurs when a merchant is able to prove the legitimacy of the initial transaction, and the charge reappears on the cardholder's account (thus reversing the chargeback).

## A.    The Scheme

In the first part of 2008, during a period of declining sales volume at CCL, Greenberg called Jason Mizrahi, a CCL graphic designer, to task him with creating a template, supposedly for distribution to customers, to promote a CCL

---

[5] This opinion uses two terms to refer to the actors who execute these transactions.  An "issuing bank" is a financial institution that issues credit and debit cards to customers.  An "acquiring bank" is a financial institution that enters into agreements with merchants enabling them to accept and process credit card charges for payment.   In this case, BAMS served as the acquiring bank.

"Frequent Shopper Club." This was unusual, as Mizrahi generally received assignments from his direct supervisor, head graphic designer Lisa Chin, and not Greenberg. Mizrahi designed the promotion template and provided it to Greenberg, but the designer never saw his work product on the CCL website. Greenberg did, however, send the template to Venkata Chittabathini, a CCL computer programmer, and directed him to create a program for charging customer credit cards in connection with the membership program. Notably, despite these undertakings by Greenberg, other CCL employees who were otherwise heavily involved in CCL's marketing and sales (including CCL's customer service manager, Simcha Geller, its warehouse manager, Alejandro Rubenstein, and Chin) never discussed the Frequent Shopper Club with Greenberg or were ever directly informed of its existence.[6]

During the summer of 2008, CCL received an influx of complaints from customers asserting that their credit cards had been charged even though they had not placed an order with CCL. Customers making such complaints

---

[6] This was unusual. Chin was normally responsible for creating marketing materials that were posted on the company's website and emailed to customers. She was unaware of the Frequent Shopper Club and never saw any promotion for the club even though she checked the CCL website daily and reviewed CCL's promotional emails. Similarly, Geller maintained an email account specifically to monitor CCL's advertisements and promotions, but he never received any email concerning a frequent shopper club.

testified at trial that they had made at least one purchase from CCL in the past, and they were unaware that CCL had retained their credit card information. Numerous customers attempted to contact CCL about the charges during this period, but their calls and voicemails frequently went unanswered. Charged in amounts ranging from $29.99 to $79.99, various of these customers testified at trial that they had never joined a frequent shopper club and had never received promotional emails or any other communication from CCL concerning such a club.

As complaints mounted, Geller informed Greenberg about the influx sometime in June 2008.[7] Greenberg responded that a computer programmer was working on the problem, a computer glitch. Even as Geller noted the questionable transactions continuing to increase—he testified that they eventually reached tens of thousands of dollars a day—Greenberg never mentioned the Frequent Shopper Club in his discussions with Geller about the

---

[7] Chin also raised the issue with Greenberg, who suggested to her that these unauthorized charges were occurring because of fraud by "some other company" or a "test" conducted by a "credit card company" that "wasn't supposed to go out and . . . did by accident." App'x 509-11. In fact, an unauthorized CCL charge of $39.99 appeared on Chin's own credit card statement, but Greenberg instructed Chittabathini to remove it after Chin complained.

7

issue.[8]  Greenberg, however, did ask Geller whether payment for these transactions had come into the company's bank accounts.

During this period, other companies that had a relationship with CCL—TRUSTe, Cynergy, and Shop.com—noticed increased consumer complaints regarding unauthorized charges and began to make inquiries. Greenberg provided inconsistent explanations to each company. Thus, Greenberg told a TRUSTe compliance officer that the charges were due to a computer glitch that had occurred over the Fourth of July weekend, affecting "at most 100 consumers," all of whom had been or would be given chargebacks.[9] App'x 261. In a follow-up email, Greenberg mentioned the Frequent Shopper Club, claiming that CCL had been offering it to customers "for years at various times and in various formats" and that "thousands of previous members [had] gladly paid and renewed yearly for several years already." App'x 269. In July, Greenberg explained to Cynergy that the chargebacks were due to customers who initially joined the Frequent Shopper Club but were disgruntled because

---

[8] Geller, who testified both that Greenberg was the only person at CCL with the ability and authorization to charge a customer's credit card and that he could do so remotely, recounted that the first time he, Geller, saw a direct reference to the Frequent Shopper Club was in a bank document related to credit card chargebacks.

[9] Greenberg's explanation was particularly suspicious because TRUSTe had received complaints before July 4, 2008.

8

they were not able to get through to CCL's customer service department because of the flood of interest in the program. Last, when Shop.com inquired as to the "alarming number of inquiries from customers" about unauthorized charges, Greenberg explained that the charges resulted from "a promotion offering consumers a members only shipping benefit." App'x 411-12. He specified that none of CCL's customers' personally identifiable information had been compromised. Ultimately, owing to continuing customer complaints and Greenberg's insufficient explanations, TRUSTe, Cynergy, and Shop.com all terminated their respective relationships with CCL.

Between June and August 2008, CCL customers incurred over 77,000 unauthorized charges, totaling approximately $5 million.[10] Approximately 44,000 chargebacks in the total amount of about $3.3 million resulted from customers disputing the charges with the issuing banks. Greenberg defended the validity of the charges, however, causing approximately 19,000 of the chargebacks to be reversed, so that over $1.3 million of the unauthorized charges reappeared on customers' credit card statements. Between July and August

---

[10] There were, in fact, many more attempted CCL charges but many of the credit card accounts involved had been closed or had expired before the charges were attempted.

2008, Greenberg transferred nearly $1 million from his CCL merchant account to various other bank accounts which he controlled.

## B.    The FTC Action

On June 24, 2009, the FTC filed a civil action against both Greenberg and CCL in the United States District Court for the Eastern District of New York (Wexler, *J.*).   *FTC v. Classic Closeouts, LLC*, 09-cv-2692 (LDW).   The FTC alleged that Greenberg and CCL had engaged in "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a), in violation of Section 5 of the FTC Act, by repeatedly charging customers' credit cards without their authorization.   On June 29, 2009, the district court entered a temporary restraining order ("TRO") against CCL, and appointed a temporary receiver (the "Receiver") to prevent, among other things, destruction of evidence.

The Receiver interviewed Greenberg at the Premises the very next day. According to the Receiver's account of that interview, presented in a report to the district court later that summer, Greenberg claimed that in January 2009, he sold CCL to Hazen NY Inc. ("Hazen"), a company owned by CCL's former warehouse manager, Jonathan Bruk.   Greenberg indicated that after the sale he

10

maintained his office at the Premises and worked as a consultant to Hazen.[11] The Receiver also reported that the FTC attempted to preserve evidence that day by imaging the hard drives of CCL computers, but FTC employees were unable to image everything owing to power failures. When the FTC's computer specialist returned the next day to complete the task, he was denied access to the premises.

In her report to the district court, dated August 20, 2009, the Receiver concluded that the sale of CCL to Hazen "may be a sham" and that "CCL's operations may be continuing through the [n]ew [d]efendants."[12] Gov't App'x 14. The report explained that the original defendants had failed to cooperate with the Receiver, as the TRO required, by "failing to provide repeatedly requested documentation about the . . . assets and transfers of money and property." *Id.* Next, the report indicated that the Receiver had found "no evidence of a legitimate transfer of ownership of CCL." *Id.* at 15. The report explained that although CCL was apparently "not operating," it "may [have

---

[11] Greenberg also indicated that he was the sole owner of 110 West Graham Avenue Corporation, which leased and retained control over the Premises.

[12] The FTC commenced its action against only CCL and Greenberg. In its Amended Complaint, however, the FTC named several additional defendants: IVAL Group, LLC, AYC Holdings Corp., 110 West Graham Avenue Corp., Bruk, Hazen, Stephanie H. Greenberg, and YGC Enterprises, Inc.

11

been] continuing its sales operations through certain of the [n]ew [d]efendants."

*Id.* at 17. Last, the report detailed evidence of transfers of CCL's assets to new defendants, and the failure to produce documents.

On September 21, 2009, CCL was evicted from the Premises. According to the Government, in that eviction, representatives of Bennett Moving, Storage and Evictions ("Bennett") took possession of all of CCL's property, including its computers and servers, and transferred it to United Storage, a storage facility in West Hempstead, New York.

## C. The Criminal Investigation

The criminal investigation began in February 2010, some seven or eight months after the FTC action commenced. The Government asserts that on April 14, 2010, Inspector Charles Schriver of the United States Postal Inspection Service contacted Bennett, the company that had taken possession of CCL's property, and was informed that Greenberg had retrieved it. Inspector Schriver next contacted United Storage, which confirmed that the CCL property, including the computers and servers, had been removed in January 2010. Schriver thereafter obtained copies of the previously-imaged CCL hard drives from the FTC. The FTC indicated to Schriver in an email that some of the data from CCL computers

12

and servers had not been successfully acquired.   The FTC retained the originally imaged computer evidence in Washington, D.C.

Discussions between the United States Attorney's Office for the Eastern District of New York ("EDNY") and Jason Berland, an attorney representing Greenberg, began months before Greenberg was first indicted in April 2012.   On January 12, 2012, Berland, one of numerous successive attorneys who represented Greenberg in connection with the criminal case, emailed Inspector Schriver and the Assistant United States Attorney ("AUSA") handling the investigation.   The email stated that Greenberg retained "back-up copies of the servers that he and some of his employees were able to access at Classic Closeouts," and that data that Berland had reviewed with Greenberg and also "discussed with a forensic analyst," had been obtained from these back-ups and would be provided to the Government.   Gov't App'x 21.   Two weeks later, on January 26, 2012, Berland reported that Greenberg possessed "a few dozen gigabytes of data to be analyzed" and indicated that he would obtain the material for the Government to review.   *Id.* at 26.   On February 1, 2012, Berland again emailed, attesting that he would provide "data pertinent to establishing that an email went out to customers and that there were legitimate customer

13

enrollments" and expressing the hope that this "conclusive proof" would persuade the Government not to move forward with the case. *Id.* at 35. Berland indicated that Greenberg was "finishing the process of copying the data to a back-up drive" and that Berland would thereafter provide it. *Id.*

Berland's efforts did not ultimately dissuade the Government from seeking an indictment. More pertinent here, the Government asserts that neither Greenberg nor his counsel indicated during this period leading up to indictment "that Greenberg lacked the evidence to prove his innocence or that the CCL computers and servers were in the possession or control of someone other than Greenberg." Gov't Br. 8. At the conclusion of the negotiations, Berland thanked the AUSA for "extraordinary" generosity with her time "over the past couple of months" during which these negotiations occurred. Gov't App'x 36.

## II. Procedural History

On April 26, 2012, the Government filed a three-count indictment against Greenberg and about one month later provided him with its initial discovery letter, which indicated that "[t]he replica of hard drives seized by the Federal Trade Commission [was] being stored" and was "available for copy." Letter Regarding Discovery at 8, *United States v. Greenberg*, No. 12-cr-0301 (ADS)

14

(E.D.N.Y. May 30, 2012), ECF No. 27.  After the Government filed the Superseding Indictment in November 2012, Greenberg's new lawyer, John Wallenstein, requested an adjournment of the trial date so that he could obtain certain records from Greenberg's former attorneys in the FTC civil proceeding, and so that he could review the CCL evidence copied by the FTC in June 2009 and the associated chain of custody logs.  In May 2013, Wallenstein contacted the AUSA to inquire about the original CCL computers and servers.  The Government responded that the FTC had left the original computers and servers on CCL's premises with Greenberg and Bruk and that it did not know where they were currently located.

On June 13, 2013, after replacing Wallenstein, Greenberg filed a motion seeking dismissal of the Superseding Indictment based on the Government's alleged spoliation of evidence.[13]  In a declaration, Greenberg admitted that he had known, from June 2009, that the FTC had not captured all the CCL computer and server data.  Without discussing what had happened with the computers and servers after the FTC's attempt to image the data, he also declared that he learned from Wallenstein in May 2013 that Wallenstein had inquired and been

_____

[13] Greenberg also filed a motion to dismiss the wire fraud counts of the Superseding Indictment – Counts One through Eight – on May 24, 2013.  The district court denied this motion after hearing argument on November 1, 2013.

advised by the Government that the original computers and servers were not in Washington, D.C., and that their whereabouts were unknown. Greenberg argued that though he had saved some data to his personal computer, including evidence of emails sent to customers, he could not introduce this evidence at trial because he would not be able to establish chain of custody for these materials. The district court denied the motion without an evidentiary hearing, concluding that Greenberg had "failed to show bad faith on the part of the government" and that this showing was "[v]ery important for a spoliation motion." App'x 101-02.

Trial commenced a few weeks later and spanned about three weeks. On January 24, 2014, the jury convicted Greenberg on all thirteen counts of the Superseding Indictment.[14] On October 31, 2014, the district court sentenced Greenberg principally to 84 months' incarceration, three years' supervised release, and restitution in the sum of $1,125,022.58. On November 7, 2014, the district court entered a corrected judgment of conviction and order of forfeiture. This appeal followed.

---

[14] The only evidence that Greenberg introduced in putting forth his defense at trial was a set of bank records admitted pursuant to a stipulation.

## DISCUSSION

This opinion addresses two of Greenberg's claims on appeal: (1) whether the Superseding Indictment should have been dismissed for spoliation of material evidence (or, in the alternative, whether the district court should have held an evidentiary hearing concerning the prosecution's bad faith); and (2) whether the Superseding Indictment fails to plead a legally cognizable wire fraud scheme under 18 U.S.C. § 1343 because there is a lack of convergence between the intended victims of the scheme and the parties deceived.

### I

We first consider Greenberg's argument that the Superseding Indictment should have been dismissed based on spoliation of material evidence—CCL's computers and servers—or, in the alternative, that an evidentiary hearing should have been held concerning the prosecution's bad faith.  We review for abuse of discretion a district court's decision whether to dismiss a case on the ground that spoliation of evidence has deprived the defendant of a fair trial.  *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  We will reject the district court's factual findings in support of its decision only if they are clearly erroneous.  *See United States v. Rahman*, 189 F.3d 88, 139 (2d Cir. 1999); *see also*

*United States v. Morgenstern*, 933 F.2d 1108, 1116 (2d Cir. 1991). Discerning no error, much less an abuse of discretion, in the district court's decision, we conclude that Greenberg's argument is without merit.

A criminal defendant moving for dismissal on the basis of spoliation of the evidence must make a two-pronged showing that the evidence possessed exculpatory value "that was apparent before [it] was destroyed"and that it was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984); *see also United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989). In addition, while *Brady v. Maryland*, 373 U.S. 83 (1963), teaches that good or bad faith is irrelevant when the Government suppresses or fails to disclose material exculpatory evidence, when the Government has, instead, failed to preserve evidentiary material that is "potentially useful," such failure "does not violate due process *unless a criminal defendant can show bad faith*'" on the part of the Government. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Failure to satisfy any of these requirements, including a failure to show the Government's bad faith, is fatal to a defendant's spoliation motion. *See Rastelli*, 870 F.2d at 833; *see also United States v. U.S.*

18

*Currency in the Amount of $228,536.00*, 895 F.2d 908, 917 (2d Cir. 1990) (noting that "unless a defendant can show bad faith . . . destruction of potentially useful evidence is not a denial of due process").

At the outset, it is doubtful that Greenberg's moving papers even raised a due process issue regarding the failure to preserve evidence. As we have said in the past, "the record must first show that evidence has been lost and that this loss is 'chargeable to the State.'" *Rahman*, 189 F.3d at 139 (quoting *Colon v. Kuhlmann*, 865 F.2d 29, 30 (2d Cir. 1988)). The FTC, in its civil investigation, sought to image the computer hard drives. These images were deficient and incomplete in various ways—a fact that Greenberg admits to knowing at the time and that was also disclosed to the defense during discovery. Greenberg now complains that the FTC acted negligently in imaging the drives. Even assuming such negligence, however, at the time of the civil investigation only the FTC was involved and Greenberg points to no evidence that a criminal indictment was directly contemplated. *See Rahman*, 189 F.3d at 139-40 (holding that the loss of recordings made without the awareness of the criminal investigators could not be charged to the prosecution). And while he asserts in his opening brief that "the prosecution team was equally culpable for failing to take adequate steps to

collect the original computers and servers," Greenberg Br. 42, Greenberg points to no facts consistent with this assertion and does not provide substantive support for his argument that the failure to *collect* evidence could ground a due process claim in circumstances analogous to those here.

Setting this problem aside, Greenberg's argument still fails. We may assume *arguendo* that the missing computer data satisfied *Trombetta*'s two-pronged test: that the data that the FTC did not image in June 2009 was potentially useful to the defense and that Greenberg was unable to obtain comparable evidence by reasonably available means. Greenberg's argument on appeal is nevertheless without merit because, as the district court concluded, the record is devoid of evidence that the Government acted in bad faith in failing to preserve the data. *See United States v. Pirre*, 927 F.2d 694, 697 (2d Cir. 1991) (noting that even assuming unpreserved evidence "might have been potentially useful" to the defense, "absent bad faith there is no violation"); *Rastelli*, 870 F.2d at 833 (noting that where "record is barren of proof that the government lost the evidence in bad faith," "[o]n this ground alone, the missing-evidence claim must fail").

20

Greenberg's arguments to the contrary do not point to ways in which he can overcome this evidentiary gap. He contends, first, that "'bad faith' in the context of a spoliation motion can be established short of the intentional destruction of documents" by mere "carelessness in preserving documents of obvious relevance and importance." Greenberg Br. 41. But this argument (even assuming that Greenberg could point to facts in support of it) is foreclosed by *Youngblood*, where the Supreme Court held that the loss of semen samples that were of obvious potential use to the defense did not deprive the defendant of due process where this loss by police could "at worst be described as negligent." 488 U.S. at 58; *see also Fisher*, 540 U.S. at 548 (holding that the mere fact that destroyed evidence was at the time sought in a pending discovery request did not "eliminate[] the necessity of showing bad faith on the part of police").[15]

Greenberg next attempts, in passing, to bolster his allegation of bad faith with the claim that the information the FTC was unable to image was materially

---

[15] Greenberg relies on our decision in *United States v. Grammatikos* to argue that the appropriateness of sanctions for the failure to preserve evidence depends on a case-by-case assessment of the Government's "culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." 633 F.2d 1013, 1020 (2d Cir. 1980). *Grammatikos*, however, was decided before *Youngblood* and must be read in light of this subsequent Supreme Court precedent. Further, Greenberg fails to articulate how the *Grammatikos* test would be applied in the present case or to highlight facts that would support an alternate analysis.

exculpatory, not simply of potential use in his defense. Greenberg Reply Br. 16.

The "presence or absence of bad faith," however, as the Supreme Court noted in *Youngblood*, "necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56 n.*. Suffice it to say here, moreover, that Greenberg offers no facts in support of his conclusion that the evidence was materially exculpatory, much less that the Government could have known this information. Greenberg relies heavily on the district court's observation, before trial, that while Greenberg's motion to dismiss the indictment was properly denied for failure to show bad faith, Greenberg satisfied *Trombetta*'s two prongs by showing that the missing computer data had exculpatory value and that he could not obtain comparable evidence through other reasonably available means. The district court, however, did *not* conclude that the missing data was materially exculpatory, as opposed to potentially useful. After hearing the evidence at trial, moreover, the court observed, in denying Greenberg's request for an adverse inference instruction regarding this missing evidence, that "[t]he evidence in this trial, the overwhelming evidence, is that the computers and servers would show evidence

contrary, *against*, the interests of the defendant." App'x 576 (emphasis added). We see no reason to disagree.

In sum, "the record is barren of proof that the government [failed to preserve] the evidence in bad faith." *Rastelli*, 870 F.2d at 833-34. As the district court noted, the record instead reveals, at most, that the FTC in a civil action had access to computer data that was not successfully imaged on the first attempt and that a complete image was never thereafter obtained by criminal investigators. None of this suggests bad faith and thus, as the district court concluded, there is no merit to Greenberg's argument that he was denied a fair trial. We discern no error in this conclusion, nor in the district court's related determination not to hold an evidentiary hearing on the issue. *See United States v. Binday*, 804 F.3d 558, 593 (2d Cir. 2015) (noting that a district court's denial of evidentiary hearing is reviewed for abuse of discretion).

## II

Greenberg next contends that the district court erred in denying his motion to dismiss the wire fraud counts in the Superseding Indictment, Counts One through Eight, because they failed to articulate a legally cognizable wire fraud scheme. Specifically, Greenberg advances the "convergence theory" of

wire fraud, which, he argues, requires the party defrauded and the party injured to be one and the same. Here, Greenberg argues that because the Superseding Indictment alleged that he "lied not to the customers, but to the issuing banks and credit card processors when they confronted him with disputed charges," there was a "lack of convergence between the intended victim of the scheme and the party deceived." Greenberg Br. 44. We review *de novo* a district court's denial of a motion to dismiss charges in an indictment. *United States v. Yousef*, 327 F.3d 56, 137 (2d Cir. 2003).

The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. Thus, the "essential elements" of the crime are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Binday*, 804 F.3d at 569 (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)); *see also United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). As we have recently reiterated, "[t]he gravamen of the offense is the scheme to defraud." *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (quoting

24

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)); *cf. Binday*, 804 F.3d at 569 ("'Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way.'" (quoting *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991))).

To that end, the wire fraud statute requires the Government to show proof of a "scheme or artifice to defraud," 18 U.S.C. § 1343, "which itself demands a showing that the defendant possessed a fraudulent intent," but the Government need not prove "that the victims of the fraud were *actually* injured," but only "that defendants *contemplated* some actual harm or injury to their victims." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)); s*ee also Neder v. United States*, 527 U.S. 1, 25 (1999) (noting that these fraud statutes "prohibit[] the 'scheme to defraud,' rather than the completed fraud"). Nothing in these statutory texts, moreover, suggests that the scheme to defraud must involve the deception of the same person or entity whose money or property is the object of the scheme. To the contrary, we agree with the First Circuit that the statutory language in both the mail and wire fraud statutes "is broad enough to include a wide variety of deceptions intended to deprive another of money or property" and "[w]e see no reason to read into the

statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud." *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998).

We have never read the wire and mail fraud statutes as limited to schemes in which the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive. Indeed, we have declined opportunities to do so. *See Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 263 (2d Cir. 2004), *rev'd in part, vacated in part on other grounds*, 547 U.S. 451 (2006); *United States v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992). Greenberg marshals only two Second Circuit cases in support of his argument: *United States v. Evans*, 844 F.2d 36 (2d Cir. 1988), and *United States v. Covino*, 837 F.2d 65 (2d Cir. 1988). In *Evans*, however, although we observed that it "seems logical that the deceived party must lose some money or property," 844 F.2d at 39, we specifically declined to adopt that proposition as an element of wire fraud. *Id.* at 40 ("[T]he case before us today does not require us to decide this general question."); *see also Anza*, 373 F.3d at 262-63 (discussing, among other cases, *Evans*, and explaining that although such cases discussed the convergence theory, "[t]his Court has not held that the civil-RICO plaintiff who alleges mail fraud or wire fraud must have been

26

the entity that relied on the fraud"); *United States v. Novod*, 923 F.2d 970, 974 (2d Cir. 1991), *on reh'g*, 927 F.2d 726 (2d Cir. 1991) ("*Evans* contended in part that the property must belong to the deceived party . . . . We did not reach this question . . . ."). And Greenberg's reliance on *Covino* is likewise inapposite, as the language he cites was in consideration of a wholly different issue—namely, whether the withholding of material information concerning breach of a fiduciary duty amounted to a deprivation of property under the statute. *See id.*, 837 F.2d at 71-72.

Thus, in this case we join at least four sister circuits and make clear that we reject the requirement of convergence urged by Greenberg: wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme.[16] Because the wire fraud

---

[16] We join the First, Fifth, Seventh, and Eighth Circuits. *See United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013) ("[T]his Court does not interpret the mail fraud statute as requiring convergence between the misrepresentations and the defrauded victims."); *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010) (concluding that "[t]he Government was not required to prove that misrepresentations were made directly to any of the victims" in pursuing a mail fraud conviction where defendants filed false financial reports with the state department of insurance resulting in risk and financial loss to policyholders); *Christopher*, 142 F.3d at 54 (upholding the wire fraud conviction of a defendant that deceived state insurance regulators, but that resulted in financial losses of policyholders, because it could find "no reason to read into the [mail and wire] statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud"); *United States v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997) (concluding that "a defendant who makes false

statute does not impose a convergence requirement, the district court did not err in denying Greenberg's motion to dismiss the wire fraud counts in the Superseding Indictment for failure to plead a legally cognizable scheme. That the Superseding Indictment alleges that Greenberg's misrepresentations were directed at acquiring banks and others, but that the credit card holders were the intended victims of the scheme, is irrelevant.[17] We reject Greenberg's argument to the contrary.

## CONCLUSION

For the foregoing reasons, and for those stated in the summary order that accompanies this decision, we **AFFIRM** the judgment of conviction.

---

representations to a regulatory agency in order to forestall regulatory action that threatens to impede the defendant's scheme to obtain money or property from others is guilty [of violating the mail fraud statute]" even though it was the policyholders who incurred the financial losses).

[17] The government also argues that, even if we were to adopt a convergence requirement, the Superseding Indictment, contrary to Greenberg's claims, sufficiently alleged such convergence. However, we have no need to address this contention in light of our holding today.