16-3861-cr
*United States v. Weaver*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: May 31, 2017   Decided: June 21, 2017)

Docket No. 16-3861-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

EDWARD MORRIS WEAVER, a/k/a NED,

*Defendant-Appellant.*[*]

Before:

NEWMAN, CABRANES, and LYNCH, *Circuit Judges.*

Edward Weaver appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Joan M. Azrack, *Judge*). Weaver was convicted of conspiring to commit mail and wire

---

[*] The Clerk of Court is directed to amend the official caption as set forth above.

fraud and various substantive charges based on his work at Vendstar, a company that sold valueless vending-machine business opportunities to its victims. Vendstar's salespeople routinely lied to customers in order to convince them to purchase the machines by promising unrealistic profits and making other false claims. On appeal, Weaver argues, *inter alia*, that he is not guilty of fraud or conspiracy because Vendstar customers signed purchase agreements in which they disclaimed reliance on extra-contract representations. He contends that those disclaimers rendered the salespeople's oral misrepresentations immaterial as a matter of law. We disagree. Thus, for the reasons stated below and in an accompanying summary order, we AFFIRM the judgment of conviction and the sentence in all respects.

--------

GEORGE W. HICKS, JR. (C. Harker Rhodes IV and Michael D. Lieberman, *on the brief*), Kirkland & Ellis LLP, Washington, DC, for defendant-appellant.

DOUGLAS LETTER (Scott R. McIntosh and William E. Havemann, Appellate Staff, *on the brief*), *for* Chad A. Readler, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC; Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, NY, for appellee.

--------

PER CURIAM:

Edward Weaver appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Joan M. Azrack, *Judge*). Weaver was convicted of conspiring to commit mail and wire fraud,  substantive counts of both, and making false statements to a government

agent, based on his work at Vendstar, a company that sold valueless vending-machine business opportunities to its victims. Vendstar's salespeople routinely lied to customers in order to convince them to purchase the machines by promising unrealistic profits and making other false claims. On appeal, Weaver argues, *inter alia*, that he is not guilty of fraud or conspiracy because Vendstar customers signed purchase agreements in which they disclaimed reliance on extra-contract representations. He contends that those disclaimers rendered the salespeople's oral misrepresentations immaterial as a matter of law.

We disagree. Thus, for the reasons stated below and in an accompanying summary order, we AFFIRM the judgment of conviction and the sentence in all respects.

## BACKGROUND

From 2004 to 2010, Edward Weaver was the CEO of Vendstar (also known as Multivend LLC), a corporation that sold candy-vending machines to approximately 7,000 customers who spent a total of about $62 million on the investments. Vendstar purported to offer customers the ability to "build a successful home-based vending business" that would earn them profits of as much as $800 a day. Supplemental Appendix ("S.A.") 227, 244. The company sold

3

small vending machines that included three clear canisters and dispensed loose handfuls of candy for twenty-five cents.

Although Vendstar's promotional materials and salespeople represented that the investment opportunities would be lucrative, for the most part the vending machines would earn Vendstar's customers almost no money. Customer complaints became so frequent that Weaver assigned a Vendstar employee to respond to those complaints full time. In the end, many customers lost virtually all of their investments in Vendstar.[1] The size of the investments varied, and the most common transaction involved the victim paying $10,000 for a package that included 30 candy-vending machines and an initial supply of candy, although some customers spent significantly more than that.

In general, the Vendstar scheme operated as follows. Potential customers would respond to Internet or newspaper advertisements, approved by Weaver, for the vending machine investments. After potential customers inquired about the opportunity, Vendstar would mail them a brochure, order form, and certain disclosure documents. The brochure, which Weaver also approved, included

---

[1] At trial, three customers testified for the defense that they profited from their vending-machine investments. Twenty-three other customers testified (for the government) that Vendstar defrauded them of large amounts of money.

claims that the salespeople were "Vendstar vendors themselves" and promised that the investments had "little risk." S.A. 226, 233. Vendstar salespeople would then follow up with customers over the phone. During those phone conversations, salespeople routinely lied to customers, promising them utterly unrealistic earnings and claiming that the investments were sound. Salespeople also falsely stated that they owned their own Vendstar machines, a misrepresentation that encouraged customers to trust them and buy the machines.[2] At trial, victims of the scam testified that those lies influenced their decision to purchase the machines.

After customers agreed to purchase the machines, they were required to sign a contract setting forth the terms of those purchases. The contracts included disclaimers in capital letters, providing in relevant part that:

> Purchaser understands that seller has no affiliation or financial relationship with professional locating companies and that seller has no involvement whatsoever in securing retail locations. . . .

---

[2] Vendstar also coordinated with so-called "locating companies" that claimed that they would install the vending machines in advantageous places to maximize profits. Customers would pay those locating companies a separate fee to place their machines. In many instances, the locating services themselves also turned out to be fraudulent, and Vendstar salespeople consistently overstated the companies' expertise and ability to place the machines in profit-earning locations.

> Purchaser and seller agree that this purchase order contains the entire understanding of the agreement between the parties and there is no reliance upon any verbal representation whatsoever. Seller has not guaranteed any minimum or maximum earnings. . . .
>
> It is further acknowledged that no statements, promises[,] or agreements influenced this purchase or are expected other than anything contained in this purchase order. . . .

Joint Appendix ("J.A.") 585-86.[3] When customers expressed concern about these disclaimers, salespeople misleadingly dismissed the provisions as unimportant "legalese" or "mumbo-jumbo." S.A. 8, 178.

In 2013, a grand jury returned a superseding indictment charging Weaver with mail and wire fraud, conspiracy to commit mail and wire fraud, and making false statements to government officials.[4] The government alleged that Weaver, along with many of his employees, sought to defraud Vendstar's customers by promising profits that they knew would not materialize. Weaver was convicted

---

[3] Although the disclaimers appeared in all capital letters, we normalize their typeface here.

[4] Those counts included: (1) one count of mail fraud, 18 U.S.C. § 1341; (2) eight counts of wire fraud, 18 U.S.C. § 1343; (3) one count of conspiracy, 18 U.S.C. § 371; and (4) one count of making a false statement in response to FBI questioning, 18 U.S.C. § 1001. The indictment also charged other defendants involved in Vendstar with related crimes.

on all counts after a six-week jury trial. The district court denied his motion for a judgment of acquittal on all counts and, in the alternative, a new trial. The district court later sentenced Weaver principally to 60 months' imprisonment. Weaver timely appealed.

We need not recount further facts here, since we have described only those facts necessary to resolve the narrow question addressed in this opinion: whether the disclaimers in Vendstar's purchase agreements rendered earlier misrepresentations immaterial as a matter of law for purposes of the mail and wire fraud statutes. The remaining issues on appeal are disposed of in an accompanying summary order.

## DISCUSSION

Weaver contends that the district court erred in denying him a judgment of acquittal on the fraud and conspiracy counts because the disclaimers in the vending-machine purchase agreements rendered any earlier misrepresentations immaterial as a matter of law.[5] We review *de novo* the denial of a judgment of acquittal under Federal Rule of Criminal Procedure 29. *United States v. Persico*,

---

[5] Weaver does not otherwise contest the materiality of the misrepresentations that his employees made to Vendstar customers.

645 F.3d 85, 104 (2d Cir. 2011).

"The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotation marks omitted). "Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (internal quotation marks omitted). "[T]he gravamen of the offense is the scheme to defraud." *Id.* (internal quotation marks omitted). In order to prove the existence of a scheme to defraud, the government must also prove "that the misrepresentations were material," *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016), and that the defendant acted with fraudulent intent, *Greenberg*, 835 F.3d at 305-06.

A statement is material if the "misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc) (discussing honest services fraud). In other words, a "lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's

8

evaluation of a proposal." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013).

A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed." *Id.* (internal quotation marks omitted). Recently, the Supreme Court explained that, "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) (internal quotation marks and alteration omitted) (discussing materiality under the False Claims Act and the common law).

We have noted the connection between the materiality element and the additional requirement that the government prove fraudulent intent. *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004). The "role of the ordinary prudence and comprehension standard [in the materiality element] is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless."*Id.*; *see United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (observing that "the focus of the mail fraud statute, like any criminal statute, is on the violator," meaning that "the purpose of the element of materiality is to ensure that a defendant actually intended to create a

9

scheme to defraud"). That is, the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme, whereas the materiality of the false statement does.

Although the materiality of the misrepresentations is an element of mail and wire fraud, the Supreme Court has held that the "common-law requirements of 'justifiable reliance' and 'damages[]' . . . plainly have no place in the federal fraud statutes." *Neder v. United States*, 527 U.S. 1, 24-25 (1999). This is so because, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage[s] would clearly be inconsistent with the statutes Congress enacted." *Id.* at 25. With respect to damages, we have explained that the government "need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims." *Greenberg*, 835 F.3d at 306 (internal quotation marks omitted, emphasis in original).

For those reasons, the Seventh Circuit has held that contractual disclaimers like the ones at issue here do not render prior false statements immaterial for purposes of criminal fraud statutes. In *United States v. Ghilarducci*, 480 F.3d 542,

546 (7th Cir. 2007), the court rejected the argument that "any oral misrepresentations [the defendants] might have made were immaterial because investors signed contracts stating that no oral promises had been made." Relying on *Neder*, the court concluded that "the reliance concept . . . ha[s] no application in the criminal fraud context." *Ghilarducci*, 480 F.3d at 546. Although a "disclaimer of reliance on certain representations . . . defeats a private damages action" for fraud, such disclaimers "do[] not mean [that] the oral representations were immaterial or without tendency to influence." *Id.* at 547. *See United States v. Lucas*, 516 F.3d 316, 339 (5th Cir. 2008) ("We are not persuaded that the disclaimer provision of these individual sales contracts insulates Defendants from the federal charges [of mail fraud]."). Weaver cites no appellate authority holding to the contrary.

We agree with our sister circuits, and hold that contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes. As explained above, the Vendstar purchase agreements included several prominent disclaimers of reliance on prior oral representations. *See* J.A. 585-86. While such disclaimers may in some circumstances defeat a civil claim for damages based on fraud, *Grumman*

11

*Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984), they do not

bear on the defendant's criminal liability.[6]  Weaver has not otherwise contested

the materiality of the oral misrepresentations, and we independently conclude

that they had the natural tendency to influence the decisionmakers to whom they

were addressed—potential Vendstar customers.

Weaver's arguments to the contrary are not persuasive, and largely

"confuse materiality . . . for reliance." *Ghilarducci*, 480 F.3d at 543. First, Weaver

contends that, because the fraud's victims signed a contract expressly

acknowledging that no earlier representation "influenced" their decision to

purchase the machines, J.A. 586, the earlier misrepresentations could not be

material because no reasonable person would alter his decision based on those

statements. That argument would effectively require reliance as part of the

materiality inquiry, and is therefore contrary to Supreme Court precedent

instructing that reliance is not an element of criminal fraud, while materiality is.

---

[6] We note that, according to trial evidence, Vendstar employees repeatedly misrepresented the importance of those disclaimers. For example, members of Weaver's sales team described the disclaimers as legal "mumbo-jumbo," S.A. 178, and dismissed customers' concerns about the provisions, explaining that Vendstar staff "would be there to support [the customers] to insure [their] success," J.A. 105.

*Neder*, 527 U.S. at 24-25. As the Seventh Circuit has observed, "[o]nce the Supreme Court excludes reliance as a separate element of the mail-fraud offense, it will not do for appellate judges to roll reliance into materiality; that would add through the back door an element barred from the front." *United States v. Rosby*, 454 F.3d 670, 674 (7th Cir. 2006). Thus, whatever analytic relationship exists between materiality and reliance, courts have consistently maintained the distinction between "materiality (in the sense of tendency to influence) and reliance (in the sense of actual influence)." *Id.*; *see United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017) (observing that a "misrepresentation may be material without inducing any actual reliance" (internal quotation marks omitted)).

By relying on civil fraud cases, where reasonable reliance is required, Weaver attempts to frame the issue of materiality as one of contract law, not criminal liability. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 576 (2d Cir. 2005); *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993); *Grumman*, 748 F.2d at 734. In describing the elements of civil fraud, we have held that, when the "contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on

13

those representations." *Manufacturers Hanover Trust Co.*, 7 F.3d at 315. That rule embodies the key contractual "principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship." *Grumman*, 748 F.2d at 735. If Vendstar's victims were plaintiffs in a civil damages action, that risk-allocation principle would have some force. It has none, however, where the government criminally prosecutes defendants for participating in a "scheme or artifice to defraud," 18 U.S.C. §§ 1341, 1343. Fraudsters may not escape criminal liability for lies told to induce gullible victims to make worthless investments by inducing them to sign a contract containing disclaimers of reliance.

Finally, the premise of Weaver's argument is flawed. He apparently assumes that Vendstar employees could not have been charged with mail or wire fraud until customers signed the agreement and paid Vendstar for the machines. That is, he assumes that the fraud would need to be *successful* in order for Weaver to be criminally liable for it. But under the plain language of §§ 1341 and 1343, the crimes were complete when, with fraudulent intent, Vendstar employees used the wires or mail in furtherance of a scheme to extract money from their victims via material misrepresentations. No customers had to be tricked into purchasing

14

the doomed vending-machine business opportunities in order for Weaver and his team to be charged criminally because "the government is not required to prove that an intended victim was actually defrauded" to establish guilt of mail or wire fraud. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *Greenberg*, 835 F.3d at 306. Indeed, "the only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm." *United States v. Rybicki*, 287 F.3d 257, 262 (2d Cir. 2002) *on reh'g en banc*, 354 F.3d 124 (2d Cir. 2003). Thus, although the contractual disclaimers were relevant to the jury's determination of Weaver's guilt, they did not render extra-contract misrepresentations immaterial as a matter of law.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the accompanying summary order, we AFFIRM the judgment of conviction and sentence in all respects.